# BOWMAN *v.* CHICAGO AND NORTHWESTERN RAILWAY COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 798. Submitted January 10, 1887. — Decided March 19, 1888.

The question whether, when Congress fails to provide a regulation by law as to any particular subject of commerce among the States it is conclusive of its intention that that subject shall be free from positive regulation, or that, until Congress intervenes, it shall be left to be dealt with by the States, is one to be determined from the circumstances of each case as it arises.

So far as the will of Congress respecting commerce among the States by means of railroads can be determined from its enactment of the provisions of law found in Rev. Stat. § 5258, and Rev. Stat. c. 6, Title 48, §§ 4252–4289, they are indications of an intention that such transportation of commodities between the States shall be free except when restricted by Congress, or by a State with the express permission of Congress.

A State cannot, for the purpose of protecting its people against the evils of intemperance, enact laws which regulate commerce between its people and those of other States of the Union, unless the consent of Congress, express or implied, is first obtained.

Section 1553 of the Code of the State of Iowa, as amended by c. 143 of the acts of the 20th General Assembly in 1886, (forbidding common carriers to bring intoxicating liquors into the State from any other State or Territory, without being first furnished with a certificate, under the seal of the auditor of the county to which it is to be transported or consigned, certifying that the consignee or person to whom it is to be transported or delivered is authorized to sell intoxicating liquors in the county,) although adopted without a purpose of affecting interstate commerce, but as a part of a general system designed to protect the health and morals of the people against the evils resulting from the unrestricted manufacture and sale of intoxicating liquors within the State, is neither an inspection law, nor a quarantine law, but is essentially a regulation of commerce among the States, effecting interstate commerce in an essential and vital part, and, not being sanctioned by the authority, express or implied, of Congress, is repugnant to the Constitution of the United States.

Whether the right of transportation of an article of commerce from one State to another includes by necessary implication the right of the consignee to sell it in unbroken packages at the place where the transportation terminates, *quære.*

THIS action was begun in the Circuit Court of the United States for the Northern District of Illinois, June 15, 1886, on which day the plaintiffs filed their declaration, as follows:

"George A. Bowman, a citizen of the state of Nebraska, and Fred. W. Bowman, a citizen of the State of Iowa, co-partners doing business under the name, firm and style of Bowman Bros., at the city of Marshalltown, State of Iowa, plaintiffs in this suit, by Blum & Blum, their attorneys, complain of the Chicago and Northwestern Railway Company, a citizen of the northern district of the State of Illinois, having its principal office at the city of Chicago, in said State, defendant in this suit, of a plea of trespass on the case.

"For that whereas the defendant, on May 20th, 1886, and for a long time previous thereto and thereafter, was possessed of and using and operating a certain railway, and was a common carrier of goods and chattels thereon for hire, to wit, from the city of Chicago, in the State of Illinois, to the city of Council Bluffs, in the State of Iowa.

"That said defendant was at said time and is now a corporation existing under and by virtue of the laws of the State of Illinois, and that it was and is the duty of said defendant to carry from and to all stations upon its line of railway all freight tendered it for shipment.

"That upon May 20th, 1886, the plaintiffs offered to said defendant for shipment over its line of railway, and directed to themselves at Marshalltown, Iowa, five thousand barrels of beer, which they had procured in the city of Chicago, to be shipped from said city to the city of Marshalltown, in the State of Iowa, which is a station lying and being on said defendant's line of railroad between said cities of Chicago and Council Bluffs, but the defendant then and there refused to receive said beer, or any part thereof, for shipment, to the damage of the plaintiffs of ten thousand dollars, and therefore they bring their suit, &c.

"And for that the plaintiffs, neither of whom is a hotel-keeper, a keeper of a saloon, eating house, grocery, or confectionery, on the 7th day of July, 1884, and upon several occasions thereafter, presented to the board of supervisors of

Marshall County, Iowa, a certificate signed by a majority of the legal electors of Marshalltown, Marshall County, Iowa, which stated that said Fred. W. Bowman is a citizen of said county; that both of said plaintiffs possess a good moral character, and that they (said electors) believe said plaintiffs to be proper persons, and each of them to be a proper person, to buy and sell intoxicating liquors for the purposes named in section 1526 of the Iowa Code; that at said time and upon several occasions thereafter they and each of them, the said plaintiffs, filed a bond in the sum of three thousand dollars with two sureties, which bond was approved by the auditor of said county, as is provided by section 1528 of the Code of Iowa; that thereupon said board of supervisors refused to grant such permission to either of said plaintiffs, or to them jointly.

" And for that whereas the defendant, on May 20th, 1886, and for a long time previous thereto and thereafter, was possessed of and using and operating a certain railroad and was a common carrier of goods and chattels thereon for hire, to wit, from the city of Chicago, in the State of Illinois, to the city of Council Bluffs, in the State of Iowa.

" That said defendant is a corporation existing under and by virtue of the laws of the State of Illinois; that it was the duty of the said defendant to carry from and to all stations upon its line of railway all freight that might be intrusted to it, and that it was the duty of said defendant to transport from said city of Chicago to said city of Marshalltown the five thousand barrels of beer hereinbefore and hereinafter mentioned, which plaintiffs requested it so to transport; that in the commencement of May, 1886, the plaintiffs purchased, at the city of Chicago, five thousand barrels of beer, at $6.50 per barrel, which beer they intended to send to Marshalltown, Iowa, at which place and vicinity they could have sold said beer at eight dollars per barrel, as the defendant was then and there informed; that on May 20th, 1886, said plaintiffs offered for shipment to said defendant railway company said five thousand barrels of beer, directed to said plaintiffs at the city of Marshalltown, in the State of Iowa, and requested said de-

fendant to ship said beer over its road, with which request the defendant refused to comply, and declined to ship or receive said beer or any part thereof for shipment as aforesaid, the said defendant, by its duly authorized agent, then and there stating that the said defendant company declined to receive said goods for shipment and would continue to decline to receive said goods or any goods of like character for shipment into the State of Iowa ; that on said day, to wit, May 20th, 1886, and for a long time theretofore and since, the plaintiffs were unable to purchase beer in the State of Iowa; that said plaintiffs, at said time, could procure no other means of transportation for said beer than said defendant, and that, by reason of the defendant's refusal to transport said beer, plaintiffs were compelled to sell said beer in the city of Chicago at $6.50 per barrel.

" That by reason of said refusal of said defendant to ship said beer plaintiffs have been damaged in the sum of ten thousand dollars, and therefore they bring their suit, &c."

To this declaration the defendant filed the following plea :

" Now comes the said defendant, by W. C. Goudy, its attorney, and defends the wrong and injury, when, &c., and says actio non, &c., because it says that the beer in said five thousand barrels in the plaintiffs' declaration and in each count thereof mentioned was, at the several times in said declaration mentioned, and still is, intoxicating liquor, within the meaning of the statute of Iowa hereinafter set forth ; that the city of Marshalltown in said declaration mentioned is within the limits of the State of Iowa: that the said city of Chicago in the said declaration mentioned is in the State of Illinois ; that the said beer in said declaration mentioned was offered to this defendant to be transported from the State of Illinois to the State of Iowa.

" That heretofore, to wit, on the 5th day of April, A.D. 1886, the General Assembly of the State of Iowa passed an act entitled ' An act amendatory of chapter 143 of the acts of the twentieth General Assembly relating to intoxicating liquors and providing for the more effectual suppression of the illegal sale and transportation of intoxicating liquors and

abatement of nuisances,' which act is chapter 66 of the laws of Iowa, passed at the twenty-first General Assembly of said State, and which is printed and published in the laws of Iowa for the year 1886, at page 81; to which act this defendant hereby refers and makes the same a part of this plea.

"That in and by the tenth section of said act it was and is provided as follows, to wit:

"'That section 1553 of the Code, as amended and substituted by chapter 143 of the acts of the twentieth General Assembly, be, and the same is hereby, repealed, and the following enacted in lieu thereof:

"'Sec. 1553. If any express company, railway company, or any agent or person in the employ of any express company or of any common carrier, or any person in the employ of any common carrier, or if any person, knowingly bring within this State for any other person or persons or corporation, or shall knowingly transport or convey between points or from one place to another within this State for any other person or persons or corporation, any intoxicating liquors without first having been furnished with a certificate from and under the seal of the county auditor of the county to which said liquor is to be transported or is consigned for transportation, or within which it is to be conveyed from place to place, certifying that the consignee or person to whom said liquor is to be transported, conveyed, or delivered is authorized to sell such intoxicating liquors in such county, such company, corporation, or person so offending, and each of them, and any agent of such company, corporation, or person so offending, shall, upon conviction thereof, be fined in the sum of one hundred dollars for each offence, and pay costs of prosecution, and the costs shall include a reasonable attorney fee, to be assessed by the court, which shall be paid into the county fund, and stand committed to the county jail until such fine and costs of prosecution are paid. The offence herein defined shall be held to be complete, and shall be held to have been committed in any county of the State through or to which said intoxicating liquors are transported, or in which the same is unloaded for transportation, or in which said liquors are conveyed from

place to place or delivered. It shall be the duty of the several county auditors of this State to issue the certificate herein contemplated to any person having such permit, and the certificate so issued shall be truly dated when issued, and shall specify the date at which the permit expires, as shown by the county records.'

"And the defendant avers that at the several times mentioned in said declaration, and each of them, the aforesaid section was the law of the State of Iowa in full force and wholly unrepealed, and that the said plaintiffs did not at any time furnish this defendant with a certificate from and under the seal of the county auditor of the county of Marshall, the same being the county in which said city of Marshalltown is located, and the county to which said beer was offered to be transported, certifying that the person for or to whom the said beer was to be transported was authorized to sell intoxicating liquors in said county of Marshall, nor was this defendant furnished with any such certificate by any person whatsoever.

"And the defendant avers that it could not receive said beer for transportation in the manner named and specified in the plaintiffs' declaration without violating the law of the State of Iowa above specified, and without subjecting itself to the penalties provided in said act, and that this defendant assigned, at the time the said beer was offered to it for transportation as aforesaid, as a reason why it could not receive the same, the aforesaid statute of Iowa, which prohibited this defendant from receiving said beer to be transported into the State of Iowa or from transporting the said beer into the State of Iowa.

"And this the said defendant is ready to verify. Wherefore it prays judgment, &c."

To this plea the plaintiffs filed a general demurrer, and for cause of demurrer assigned that the statute of Iowa referred to and set out in the plea was unconstitutional and void. The demurrer was overruled, and judgment entered thereon against the plaintiffs, to reverse which this writ of error is prosecuted.

*Mr. Louis J. Blum* and *Mr. Edgar C. Blum* for plaintiffs in error.

*Mr. A. J. Baker*, Attorney General of the State of Iowa, for defendant in error.

I. While it is conceded that Congress has the exclusive power to regulate commerce among the States, it is equally true that the several States have the sole power to enact police regulations, and in the exercise of such power may do many things which more or less affect the transportation of persons and freight between the States. *Wiggins Ferry Co.* v. *East St. Louis*, 107 U. S. 365; *Gibbons* v. *Ogden*, 9 Wheat. 1; *New York* v. *Miln*, 11 Pet. 102; *Osborne* v. *Mobile*, 16 Wall. 479; *Sherlock* v. *Alling*, 93 U. S. 99.

II. The police powers comprehend all those general powers of internal regulation necessary to secure peace, good order, health, comfort, morals, and quiet of all persons, and the protection of all property in the State. Congress cannot legislate on the internal police of a State, the power of a State over its police regulations being supreme. *New Orleans Water Works Co.* v. *St. Tammany Water Works Co.*, 14 Fed. Rep. 194, 202; *Ex parte Schrader*, 33 Cal. 279; *Munn* v. *Illinois*, 94 U. S. 197; *Toledo &c. Railway* v. *Jacksonville*, 67 Illinois, 37; *Davis* v. *Central Railroad*, 17 Georgia, 323; *Bartemeyer* v. *Iowa*, 18 Wall. 113.

The statute of Nevada imposing a tax upon merchandise brought into the State held constitutional. *In re Rudolph*, 2 Fed. Rep. 66.

Tax imposed on sales of merchandise in Alabama held constitutional. The court says: "The case before us is a simple tax on sales of merchandise, imposed alike upon all sales made in Mobile, whether the sales be made by citizens of Alabama or other States, and whether the goods sold are the product of that State or some other. There is no attempt to discriminate injuriously against the products of other States, or the rights of their citizens, and the case is not therefore an attempt to fetter commerce among the States, or to deprive the citizens of other States of any privilege or immunity possessed by citizens of Alabama." *Woodruff* v. *Parham*, 8 Wall. 123; *Hinson* v. *Lott*, 8 Wall. 148.

The law of New York requiring a report as to passengers brought into the State is a police regulation. *New York* v. *Miln,* 11 Pet. 102.

Statutes like the statute of Iowa now under consideration are police regulations established by the legislature for the prevention of intemperance, pauperism and crime, and for the abatement of nuisances, and are constitutional. Cooley Const. Lim. 581; *Commonwealth* v. *Kendall,* 12 Cushing, 414; *Commonwealth* v. *Clapp,* 5 Gray, 97; *Commonwealth* v. *Howe,* 13 Gray, 26; *Our House* v. *State,* 4 Greene (Iowa), 172; *Zumhoff* v. *State,* 4 Greene (Iowa), 526; *State* v. *Donehey,* 8 Iowa, 396; *State* v. *Wheeler,* 25 Conn. 290; *Reynolds* v. *Geary,* 26 Conn. 179; *Oviatt* v. *Pond,* 29 Conn. 479; *People* v. *Gallagher,* 4 Mich. 244; *Gill* v. *Parker,* 31 Vt. 610; *Meshmeier* v. *State,* 11 Indiana, 482; *Vanderbilt* v. *Adams,* 7 Cowen, 349.

It has been expressly decided by this court that as a measure of police regulation looking to the preservation of public morals a state law prohibiting the manufacture and sale of intoxicating liquor is not repugnant to any clause of the Constitution of the United States. *Bartemeyer* v. *Iowa,* 18 Wall. 129; *Beer Co.* v. *Mass.,* 97 U. S. 25; *Foster* v. *Kansas,* 112 U. S. 201.

This law has been decided to be constitutional, in its main provisions at least, by the Supreme Court of Iowa. *Littleton* v. *Fritz,* 22 N. W. Rep. 641.

It is a well settled rule, that courts will not declare legislative enactments void by reason of their repugnance to constitutions, state or federal, except when the judicial mind is clearly convinced of such repugnancy.

The legislature cannot part with any of the police powers of the State which are matters that affect the public peace, public health, public morals and public convenience. *Farmers' Loan and Trust Co.* v. *Stone,* 20 Fed. Rep. 270; *Allerton* v. *City of Chicago,* 6 Fed. Rep. 555; *In re Wong Yung Quy,* 2 Fed. Rep. 624; *Beer Co.* v. *Massachusetts, supra.*

It is well settled now that the States have the power to prohibit the sale of intoxicating liquors within the borders of the State. This prohibition must necessarily be a restriction upon

the importation of such liquors from other States, and if the prohibition was made for the purpose only of preventing such importation, it would be void, but when made for the protection of morals, public health and good order, it is clearly within the power of the State.

The right to prohibit the bringing of certain articles into the State because such importation endangers the public safety, is not affected by the fact that the articles so prohibited may be articles of property and of value as property. When the public safety demands it the State has the right to prohibit the bringing of articles or property within the limits of the State, or to impose conditions or restrictions upon such importation for the protection of the public health, morality and good order. This right has always been exercised by the States without question. Certain articles of property deemed prejudicial to the morals of the people have been excluded by the laws of the States.

Revised Statutes of Illinois, c. 38, § 379, excludes certain books, pamphlets, engravings, models, casts, lithographs, photographs, etc.

See § 9289 Howell, Annotated Stat. Mich., p. 2248; § 4022, Statutes of Iowa; § 4590 General Statutes of Wisconsin: § 12, c. 100, General Statutes of Minnesota.

In nearly every State restrictions are laid upon the importation of certain articles for the protection of the public health. Dynamite can be brought into Michigan and many other States only when packed and marked in a certain manner involving large expense.

*Mr. James E. Munroe* and *Mr. W. C. Goudy* also filed a brief for defendants in error.

MR. JUSTICE MATTHEWS, after stating the case as above reported, delivered the opinion of the court.

It is not denied that the declaration sets out a good cause of action. It alleges that the defendant was possessed of and operated a certain railway, by means of which it became and

was a common carrier of goods and chattels thereon' for hire, from the city of Chicago, in the State of Illinois, to the city of Council Bluffs, in the State of Iowa, and that, as such, it was its duty to carry from and to all stations upon its line of railway all goods and merchandise that might be intrusted to it for that purpose. This general duty was imposed upon it by the common law as adopted and prevailing in the States of Illinois and Iowa. The single question, therefore, presented upon the record is, whether the statute of the State of Iowa, set out in the plea, constitutes a defence to the action.

The section of the statute referred to, being § 1553 of the Iowa Code as amended by the act of April 5, 1886, forbids any common carrier to bring within the State of Iowa, for any person or persons or corporation, any intoxicating liquors from any other State or Territory of the United States, without first having been furnished with a certificate, under the seal of the county auditor of the county to which said liquor is to be transported or is consigned for transportation, certifying that the consignee or person to whom said liquor is to be transported, conveyed, or delivered is authorized to sell intoxicating liquors in such county.

This statutory provision does not stand alone, and must be considered with reference to the system of legislation of which it forms a part. The act of April 5, 1886, in which it is contained, relates to the sale of intoxicating liquors within the State of Iowa, and is amendatory of chapter 143 of the acts of the twentieth General Assembly of that State "relating to intoxicating liquors and providing for the more effectual suppression of the illegal sale and transportation of intoxicating liquors and abatement of nuisances." The original § 1553 of the Iowa Code contains a similar provision in respect to common carriers. By § 1523 of the Code, the manufacture and sale of intoxicating liquors, except as thereinafter provided, is made unlawful, and the keeping of intoxicating liquor with intent to sell the same within the State, contrary to the provisions of the act, is prohibited, and the intoxicating liquor so kept, together with the vessels in which it is contained, is declared to be a nuisance, to be forfeited and dealt with as

thereinafter provided. Section 1524 excepts from the operation of the law sales by the importer thereof of foreign intoxicating liquor, imported under the authority of the laws of the United States regarding the importation of such liquors and in accordance with such laws, provided that the said liquor at the time of said sale by said importer remains in the original casks or packages in which it was by him imported, and in quantities of not less than the quantities in which the laws of the United States require such liquors to be imported, and is sold by him in said original casks or packages and in said quantities only. The law also permits the manufacture in the State of liquors for the purpose of being sold, according to the provisions of the statute, to be used for mechanical, medicinal, culinary or sacramental purposes; and for these purposes only any citizen of the State, except hotel-keepers, keepers of saloons, eating houses, grocery keepers, and confectioners, is permitted within the county of his residence to buy and sell intoxicating liquors, provided he shall first obtain permission from the board of supervisors of the county in which such business is conducted. It also declares the building or erection of whatever kind, or the ground itself in or upon which intoxicating liquor is manufactured or sold, or kept with intent to sell, contrary to law, to be a nuisance, and that it may be abated as such. The original provisions of the Code (§ 1555) excluded from the definition of intoxicating liquors, beer, cider from apples, and wine from grapes, currants and other fruits grown in the State, but by an amendment that section was made to include alcohol, ale, wine, beer, spirituous, vinous and malt liquors, and all intoxicating liquors whatever. It thus appears that the provisions of the statute set out in the plea, prohibiting the transportation by a common carrier of intoxicating liquor from a point within any other State for delivery at a place within the State of Iowa, is intended to more effectually carry out the general policy of the law of that State with respect to the suppression of the illegal manufacture and sale of intoxicating liquor within the State as a nuisance. It may, therefore, fairly be said that the provision in question has been adopted by the State of Iowa,

not expressly for the purpose of regulating commerce between its citizens and those of other States, but as subservient to the general design of protecting the health and morals of its people, and the peace and good order of the State, against the physical and moral evils resulting from the unrestricted manufacture and sale within the State of intoxicating liquors.

We have had recent occasion to consider state legislation of this character in its relation to the Constitution of the United States. In the case of *Mugler* v. *Kansas*, 123 U. S. 623, 657, it was said: "That legislation by a State prohibiting the manufacture within her limits of intoxicating liquors to be there sold or bartered for general use as a beverage, does not necessarily infringe any right, privilege, or immunity secured by the Constitution of the United States, is made clear by the decisions of this court rendered before and since the adoption of the Fourteenth Amendment. . . . These cases rest upon the acknowledged right of the States of the Union to control their purely internal affairs, and in so doing to protect the health, morals, and safety of their people by regulations that do not interfere with the execution of the powers of the general government or violate rights secured by the Constitution of the United States." In *The License Cases*, 5 How. 504, the question was whether certain statutes of Massachusetts, Rhode Island, and New Hampshire, relating to the sale of spirituous liquors, were repugnant to the Constitution of the United States by reason of an alleged conflict between them and the power of Congress to regulate commerce with foreign countries and among the several States. The statutes of Massachusetts and of Rhode Island considered in those cases had reference to the sale within those States respectively of intoxicating liquor imported from foreign countries, but not sold or offered for sale within the State by the importer in original packages. The statute of New Hampshire, however, applied to intoxicating liquor imported from another State, and the decision in that case upheld its validity in reference to the disposition by sale or otherwise of the intoxicating liquor after it had been brought into the State. That judgment, therefore, closely approached the

question presented in this case. The justices all concurred in the result, but there was not a majority which agreed upon any specific ground for the conclusion, and it is necessary to compare the several opinions which were pronounced in order to extract the propositions necessarily embraced in the judgment. Chief Justice Taney was of the opinion that Congress had clearly the power to regulate such importation and sale under the grant of power to regulate commerce among the several States; "yet, as Congress has made no regulation on the subject," he said, "the traffic in the article may be lawfully regulated by the State as soon as it is landed in its territory, and a tax imposed upon it, or a license required, or the sale altogether prohibited, according to the policy which the State may suppose to be its interest or duty to pursue." p. 586. Mr. Justice Catron and Mr. Justice Nelson agreed with the Chief Justice that the statute of New Hampshire in question was a regulation of commerce, but lawful, because not repugnant to any actual exercise of the commercial power by Congress. Mr. Justice McLean seemed to think that the power of Congress ended with the importation, and that the sale of the article after it reached its destination was within the exclusive control of the State. He said: "If this tax had been laid on the property as an import into the State, the law would have been repugnant to the Constitution. It would have been a regulation of commerce among the States, which has been exclusively given to Congress. . . . But this barrel of gin, like all other property within the State of New Hampshire, was liable to taxation by the State. It comes under the general regulation, and cannot be sold without a license." p. 595. Mr. Justice Daniel denied that the right of importation included the right to sell within the State, contrary to its laws. He impliedly admitted the exclusive power of Congress to regulate importation, and maintained, as equally exclusive, the right of the State to regulate the matter of sale. Mr. Justice Woodbury concurred in the same distinction. He said (p. 619): "It is manifest, also, whether as an abstract proposition or practical measure, that a prohibition to import is one thing, while a prohibition to sell without

license is another and entirely different." The first he thought
was within the control of Congress, the latter within the
exclusive jurisdiction of the State.   He said: "The subject of
buying and selling within a State, is one as exclusively belong-
ing to the power of the State over its internal trade as that to
regulate foreign commerce is with the general government
under the broadest construction of that power.  .  .  .   The
idea, too, that a prohibition to sell would be tantamount to a
prohibition to import, does not seem to me either logical or
founded in fact.   For even under a prohibition to sell, a per-
son could import, as he often does, for his own consumption,
and that of his family and plantations; and also if a merchant
extensively engaged in commerce, often does import articles
with no view of selling them here, but of storing them for a
higher and more suitable market in another State or abroad."
He also said (p. 625): " But this license is a regulation neither ·
of domestic commerce between the States, nor of foreign com-
merce.   It does not operate on either, or the imports of either
till they have entered the State, and become component parts
of its property.   Then it has by the Constitution the exclusive
power to regulate its own internal commerce and business in
such articles, and bind all residents, citizens or not, by its reg-
ulations, if they ask its protection and privileges; and Con-
gress, instead of being opposed and thwarted by regulations as
to this, can no more interfere in it than the States can inter-
fere in regulation of foreign commerce."   Mr. Justice Grier
concurred mainly in the opinion delivered by Mr. Justice
McLean, and did not consider that the question of the exclu-
siveness of the power of Congress to regulate commerce was
necessarily connected with the decision of the point that the
States had a right to prohibit the sale and consumption of an
article of commerce within their limits, which they believed
to be pernicious in its effects, and the cause of pauperism,
disease, and crime.

From a review of all the opinions the following conclusions
are to be deduced as the result of the judgment in those cases:

1. All the Justices concurred in the proposition that the
statutes in question were not made void by the mere existence

of the power to regulate commerce with foreign nations and among the States delegated to Congress by the Constitution.

2. They all concurred in the proposition that there was no legislation by Congress in pursuance of that power with which these statutes were in conflict.

3. Some, including the Chief Justice, held that the matter of the importation and sale of articles of commerce was subject to the exclusive regulation of Congress, whenever it chose to exert its power, and that any statute of the State on the same subject in conflict with such positive provisions of law enacted by Congress would be void.

4. Others maintained the view that the power of Congress to regulate commerce did not extend to or include the subject of the sale of such articles of commerce after they had been introduced into a State, but that when the act of importation ended, by a delivery to the consignee, the exclusive power over the subject belonged to the States as a part of their police power.

From this analysis it is apparent that the question presented in this case was not decided in *The License Cases.* The point in judgment in them was strictly confined to the right of the States to prohibit the sale of intoxicating liquor after it had been brought within their territorial limits. The right to bring it within the States was not questioned; and the reasoning which justified the right to prohibit sales admitted, by implication, the right to introduce intoxicating liquor, as merchandise, from foreign countries, or from other States of the Union, free from the control of the several States, and subject to the exclusive power of Congress over commerce.

It cannot be doubted that the law of Iowa now under examination, regarded as a rule for the transportation of merchandise, operates as a regulation of commerce among the States. "Beyond all question, the transportation of freight, or of the subjects of commerce, for the purpose of exchange or sale, is a constituent of commerce itself. This has never been doubted, and probably the transportation of articles of trade from one State to another was the prominent idea in the minds of the framers of the Constitution when to Congress

was committed the power to regulate commerce among the several States. A power to prevent embarrassing restrictions by any State was the thing desired. The power was given by the same words and in the same clause by which was conferred power to regulate commerce with foreign nations. It would be absurd to suppose that the transmission of the subjects of trade from the State to the buyer, or from the place of production to the market, was not contemplated, for without that there could be no consummated trade, either with foreign nations or among the States. . . . Nor does it make any difference whether this interchange of commodities is by land or by water. In either case the bringing of the goods from the seller to the buyer is commerce. Among the States it must have been principally by land when the Constitution was adopted." *Case of the State Freight Tax*, 15 Wall. 232, 275, per Mr. Justice Strong. It was, therefore, decided in that case that a tax upon freight transported from State to State was a regulation of interstate transportation, and for that reason a regulation of commerce among the States. And this conclusion was reached notwithstanding the fact that Congress had not legislated on the subject, and notwithstanding the inference sought to be drawn from the fact, that it was thereby left open to the legislation of the several States. On that point it was said by Mr. Justice Strong, speaking for the court, as follows (p. 279): "Cases that have sustained state laws, alleged to be regulations of commerce among the States, have been such as related to bridges or dams across streams wholly within a State, police or health laws, or subjects of a kindred nature not strictly of commercial regulations. The subjects were such as in *Gilman* v. *Philadelphia*, 3 Wall. 713, it was said, 'can be best regulated by rules and provisions suggested by the varying circumstances of different localities, and limited in their operations to such localities respectively.' However this may be, the rule has been asserted with great clearness that whenever the subjects over which a power to regulate commerce is asserted are in their nature national, or admit of one uniform system or plan of regulation, they may justly be said to be of such a nature

as' to require exclusive legislation by Congress. *Cooley* v. *Port Wardens*, 12 How. 299 ; *Crandall* v. *State of Nevada*, 6 Wall. 42. Surely transportation of passengers or merchandise through a State, or from one State to another, is of this nature. It is of national importance that over that subject there should be but one regulating power, for if one State can directly tax persons or property passing through it, or tax them indirectly by levying a tax upon their transportation, every other may, and thus commercial intercourse between States remote from each other may be destroyed. The produce of Western States may thus be effectually excluded from Eastern markets, for though it might bear the imposition of a single tax, it would be crushed under a load of many. It was to guard against the possibility of such commercial embarrassments, no doubt, that the power of regulating commerce among the States was conferred upon the Federal government."

The distinction between cases in which Congress has exerted its power over commerce, and those in which it has abstained from its exercise, as bearing upon state legislation touching the subject was first plainly pointed out by Mr. Justice Curtis in the case of *Cooley* v. *Port Wardens*, 12 How. 299, and applies to commerce with foreign nations as well as to commerce among the States. In that case, speaking of commerce with foreign nations, he said (p. 319) : "Now, the power to regulate commerce embraces a vast field, containing not only many, but exceedingly various subjects quite unlike in their nature ; some imperatively demanding a single uniform rule operating equally on the commerce of the United States in every port; and some, like the subject now in question, as imperatively demanding that diversity which alone can meet the local necessities of navigation." It was, therefore, held in that case that the laws of the several States concerning pilotage, although in their nature regulations of foreign commerce, were, in the absence of legislation on the same subject by Congress, valid exercises of power. The subject was local and not national, and was likely to be best provided for, not by one system or plan of regulations, but by as many as the legislative discretion of the several States should deem appli-

cable to the local peculiarities of the ports within their limits; and to this it may be added that it was a subject imperatively demanding positive regulation. The absence of legislation on the subject, therefore, by Congress, was evidence of its opinion that the matter might be best regulated by local authority, and proof of its intention that local regulations might be made.

It may be argued, however, that, aside from such regulations as these, which are purely local, the inference to be drawn from the absence of legislation by Congress on the subject excludes state legislation affecting commerce with foreign nations more strongly than that affecting commerce among the States. Laws which concern the exterior relations of the United States with other nations and governments are general in their nature, and should proceed exclusively from the legislative authority of the nation. The organization of our state and Federal system of government is such that the people of the several States can have no relations with foreign powers in respect to commerce or any other subject, except through the government of the United States and its laws and treaties. *Henderson* v. *Mayor of New York,* 92 U. S. 259, 273.

The same necessity perhaps does not exist equally in reference to commerce among the States. The power conferred upon Congress to regulate commerce among the States is indeed contained in the same clause of the Constitution which confers upon it power to regulate commerce with foreign nations. The grant is conceived in the same terms, and the two powers are undoubtedly of the same class and character and equally extensive. The actual exercise of its power over either subject is equally and necessarily exclusive of that of the States, and paramount over all the powers of the States; so that state legislation, however legitimate in its origin or object, when it conflicts with the positive legislation of Congress, or its intention reasonably implied from its silence, in respect to the subject of commerce of both kinds, must fail. And yet in respect to commerce among the States, it may be for the reason already assigned, that the same inference is not always to be drawn from the absence of congressional legislation as might be in the case of commerce with foreign

nations. The question, therefore, may be still considered in each case as it arises, whether the fact that Congress has failed in the particular instance to provide by law a regulation of commerce among the States is conclusive of its intention that the subject shall be free from all positive regulation, or that, until it positively interferes, such commerce may be left to be freely dealt with by the respective States.

We have seen that in the case of the *State Freight Tax*, 15 Wall. 232, a tax imposed by one State upon freight transported to or from another State was held to be void as a regulation of commerce among the States, on the ground that the transportation of passengers or merchandise through a State, or from one State to another, was in its nature national, so that it should be subjected to one uniform system or plan of regulation under the control of one regulating power. In that case the tax was not imposed for the purpose of regulating interstate commerce, but in order to raise a revenue, and would have been a legitimate exercise of an admitted power of the State if it had not been exerted so as to operate as a regulation of interstate commerce. Any other regulation of interstate commerce, applied as the tax was in that case, would fall equally within the rule of its decision. If the State has not power to tax freight and passengers passing through it, or to or from it, from or into another State, much less would it have the power directly to regulate such transportation, or to forbid it altogether. If in the present case the law of Iowa operated upon all merchandise sought to be brought from another State into its limits, there could be no doubt that it would be a regulation of commerce among the States and repugnant to the Constitution of the United States. In point of fact, however, it applies only to one class of articles of a particular kind, and prohibits their introduction into the State upon special grounds. It remains for us to consider whether those grounds are sufficient to justify it as an exception from the rule which would govern if they did not exist.

It may be material also to state in this connection that Congress had legislated on the general subject of interstate commerce by means of railroads prior to the date of the transaction

on which the present suit is founded.    Section 5258 of the Revised Statutes provides that "every railroad company in the United States whose road is operated by steam, its successors and assigns, is hereby authorized to carry upon and over its road, boats, bridges, and ferries all passengers, troops, government supplies, mails, freight, and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation of the same to the place of destination."    In the case of *Railroad Co.* v. *Richmond,* 19 Wall. 584, this section, then constituting a part of the act of Congress of June 15, 1866, was considered.    Referring to this act and the act of July 25, 1866, authorizing the construction of bridges over the Mississippi River, the court say: "These acts were passed under the power vested in Congress to regulate commerce among the several States, and were designed to remove trammels upon transportation between different States which had previously existed, and to prevent a creation of such trammels in future, and to facilitate railway transportation by authorizing the construction of bridges over the navigable waters of the Mississippi.    But they were intended to reach trammels interposed by state enactments or by existing laws of Congress.  .  .  .    The power to regulate commerce among the several States was vested in Congress in order to secure equality and freedom in commercial intercourse against discriminating state legislation."    p. 589.

Congress had also legislated on the subject of the transportation of passengers and merchandise in chapter 6, title 48 of the Revised Statutes; §§ 4252 to 4289, inclusive, having reference, however, mainly to transportation in vessels by water. But §§ 4278 and 4279 relate also to the transportation of nitro-glycerine and other similar explosive substances by land or water, and either as a matter of commerce with foreign countries or among the several States.    Section 4280 provides that "the two preceding sections shall not be so construed as to prevent any State, Territory, district, city or town within the United States from regulating or from prohibiting the traffic in or transportation of those substances between persons or

places lying or being within their respective territorial limits, or from prohibiting the introduction thereof into such limits for sale, use, or consumption therein."

So far as these regulations made by Congress extend, they are certainly indications of its intention that the transportation of commodities between the States shall be free, except where it is positively restricted by Congress itself, or by the States in particular cases by the express permission of Congress. On this point the language of this court in the case of *County of Mobile* v. *Kimball*, 102 U. S. 691, 697, is applicable. Repeating and expanding the idea expressed in the opinion in the case of *Cooley* v. *Board of Port Wardens*, 12 How. 299, this court said: "The subjects, indeed, upon which Congress can act under this power are of infinite variety, requiring for their successful management different plans or modes of treatment. Some of them are national in their character, and admit and require uniformity of regulation, affecting alike all the States; others are local, or are mere aids to commerce, and can only be properly regulated by provisions adapted to their special circumstances and localities. Of the former class may be mentioned all that portion of commerce with foreign countries or between the States which consists in the transportation, purchase, sale, and exchange of commodities. Here there can of necessity be only one system or plan of regulations, and that Congress alone can prescribe. Its non-action in such cases with respect to any particular commodity or mode of transportation is a declaration of its purpose that the commerce in that commodity, or by that means of transportation, shall be free. There would, otherwise, be no security against conflicting regulations of different States, each discriminating in favor of its own products and against the products of citizens of other States. And it is a matter of public history that the object of vesting in Congress the power to regulate commerce with foreign nations and among the States was to insure uniformity of regulation against conflicting and discriminating state legislation." Also, (p. 702 :) "Commerce with foreign countries and among the States, strictly considered, consists in intercourse and traffic, including

in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities. For the regulation of commerce as thus defined, there can be only one system of rules, applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon it by separate States is not, therefore, permissible."

The principle thus announced has a more obvious application to the circumstances of such a case as the present, when it is considered that the law of the State of Iowa under consideration, while it professes to regulate the conduct of carriers engaged in transportation within the limits of that State, nevertheless materially affects, if allowed to operate, the conduct of such carriers, both as respects their rights and obligations, in every other State into or through which they pass in the prosecution of their business of interstate transportation. In the present case, the defendant is sued as a common carrier in the State of Illinois, and the breach of duty alleged against it is a violation of the law of that State in refusing to receive and transport goods which, as a common carrier, by that law, it was bound to accept and carry. It interposes as a defence a law of the State of Iowa, which forbids the delivery of such goods within that State. Has the law of Iowa any extra territorial force which does not belong to the law of the State of Illinois? If the law of Iowa forbids the delivery, and the law of Illinois requires the transportation, which of the two shall prevail? How can the former make void the latter? In view of this necessary operation of the law of Iowa, if it be valid, the language of this court in the case of *Hall* v. *De Cuir*, 95 U. S. 485, 488, is exactly in point. It was there said: "But we think it may safely be said that state legislation, which seeks to impose a direct burden upon interstate commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress. The statute now under consideration, in our opinion, occupies that position. It does not act upon the business through the local instruments to be employed after coming within the State, but directly upon the business as it comes into the State from

without or goes out from within.    While it purports only to control the carrier when engaged within the State, it must necessarily influence his conduct to some extent in the management of his business throughout his entire voyage.    His disposition of passengers taken up and put down within the State, or taken up within to be carried without, cannot but affect in a greater or less degree those taken up without and brought within, and sometimes those taken up within and put down without.    A passenger in the cabin set apart for the use of whites without the State must, when the boat comes within, share the accommodations of that cabin with such colored persons as may come on board afterwards, if the law is enforced.    It was to meet just such a case that the commercial clause in the Constitution was adopted.    The river Mississippi passes through or along the borders of ten different States, and its tributaries reach many more.    The commerce upon these waters is immense, and its regulation clearly a matter of national concern.    If each State was at liberty to regulate the conduct of carriers while within its jurisdiction, the confusion likely to follow could not but be productive of great inconvenience and unnecessary hardship.    Each State could provide for its own passengers and regulate the transportation of its own freight, regardless of the interests of others.    Nay, more; it could prescribe rules by which the carrier must be governed within the State, in respect to passengers and property brought from without.    On one side of the river or its tributaries he might be required to observe one set of rules, and on the other 'another.    Commerce cannot flourish in the midst of such embarrassments.    No carrier of passengers can conduct his business with satisfaction to himself, or comfort to those employing him, if on one side of a state line his passengers, both white and colored, must be permitted to occupy the same cabin, and on the other be kept separate.    Uniformity in the regulations by which he is to be governed from one end to the other of his route is a necessity in his business, and to secure it, Congress, which is untrammelled by state lines, has been invested with the exclusive legislative power of determining what such regulations shall be."

It is impossible to justify this statute of Iowa by classifying it as an inspection law. The right of the States to pass inspection laws is expressly recognized in Art. 1, § 10, of the Constitution, in the clause declaring that "no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws." . . . . "And all such laws shall be subject to. the revision and control of the Congress." The nature and character of the inspection laws of the States, contemplated by this provision of the Constitution, were very fully exhibited in the case of *Turner* v. *Maryland*, 107 U. S. 38. "The object of inspection laws," said Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, 203, "is to improve the quality of articles produced by the labor of a country.; to fit them for exportation; or, it may be, for domestic use. They act upon the subject, before it becomes an article of foreign commerce, or of commerce among the States, and prepare it for that purpose." They are confined to such particulars as, in the estimation of the legislature and according to the customs of trade, are deemed necessary to fit the inspected article for the market, by giving to the purchaser public assurance that the article is in that condition, and of that quality, which makes it merchantable and fit for use or consumption. They are not founded on the idea that the things, in respect to which inspection is required, are dangerous or noxious in themselves. As was said in *Turner* v. *Maryland*, 107 U. S. 38, 55: "Recognized elements of inspection laws have always been.— quality of the article, form, capacity, dimensions, and weight of package, mode of putting up, and marking and branding of various kinds — all these matters being supervised by a public officer having authority to pass or not pass the article as lawful merchandise, as it did or did not answer the prescribed requirements. It has never been regarded as necessary, and it is manifestly not necessary, that all of these elements should coexist in order to make a valid inspection law. Quality alone may be the subject of inspection, without other requirement, or the inspection may be made to extend to all of the above matters." It has never been regarded as within

the legitimate scope of inspection laws to forbid trade in respect to any known article of commerce, irrespective of its condition and quality, merely on account of its intrinsic nature and the injurious consequences of its use or abuse.

For similar reasons the statute of Iowa under consideration cannot be regarded as a regulation of quarantine or a sanitary provision for the purpose of protecting the physical health of the community, or a law to prevent the introduction into the State of disease, contagious, infectious, or otherwise. Doubtless the States have power to provide by law suitable measures to prevent the introduction into the States of articles of trade, which, on account of their existing condition, would bring in and spread disease, pestilence, and death, such as rags or other substances infected with the germs of yellow fever or the virus of small-pox, or cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption. Such articles are not merchantable; they are not legitimate subjects of trade and commerce. They may be rightly outlawed as intrinsically and directly the immediate sources and causes of destruction to human health and life. The self-protecting power of each State, therefore, may be rightfully exerted against their introduction, and such exercises of power cannot be considered regulations of commerce prohibited by the Constitution. Upon this point, the observations of Mr. Justice Catron in *The License Cases*, 5 How. 504, 599, are very much to the point. Speaking of the police power, as reserved to the States, and its relation to the power granted to Congress over commerce, he said: " The assumption is, that the police power was not touched by the Constitution, but left to the States, as the Constitution found it. This is admitted; and whenever a thing, from character or condition, is of a description to be regulated by that power in the State, then the regulation may be made by the State, and Congress cannot interfere. But this must always depend on facts subject to legal ascertainment, so that the injured may have redress. And the fact must find its support in this, whether the prohibited article belongs to, and is subject to be regulated as part of, foreign commerce, or of

commerce among the States. If, from its nature, it does not belong to commerce, or if its condition, from putrescence or other cause, is such, when it is about to enter the State, that it no longer belongs to commerce, or, in other words, is not a commercial article, then the state power may exclude its introduction. And as an incident to this power, a State may use means to ascertain the fact. And here is the limit between the sovereign power of the state and the federal power. That is to say, that which does not belong to commerce is within the jurisdiction of the police power of the State ; and that which does belong to commerce is within the jurisdiction of the United States. And to this limit must all the general views come, as I suppose, that were suggested in the reasoning of this court in the cases of *Gibbons* v. *Ogden*, *Brown* v. *The State of Maryland*, and *New York* v. *Miln*. What, then, is the assumption of the state court? Undoubtedly, in effect, that the State had the power to declare what should be an article of lawful commerce in the particular State ; and having declared that ardent spirits and wines were deleterious to morals and health, they ceased to be commercial commodities there, and that then the police power attached, and consequently the powers of Congress could not interfere. The exclusive state power is made to rest, not on the fact of the state or condition of the article, nor that it is property usually passing by sale from hand to hand, but on the declaration found in the state laws, and asserted as the state policy, that it shall be excluded from commerce. And by this means the sovereign jurisdiction in the State is attempted to be created in a case where it did not previously exist. If this be the true construction of the constitutional provision, then the paramount power of Congress to regulate commerce is subject to a very material limitation; for it takes from Congress, and leaves with the States, the power to determine the commodities, or articles of property, which are the subjects of lawful commerce. Congress may regulate, but the States determine what shall or shall not be regulated. Upon this theory the power to regulate commerce, instead of being paramount over the subject, would become subordinate to the state police

power; for it is obvious that the power to determine the articles which may be the subjects of commerce, and thus to circumscribe its scope and operation, is, in effect, the controlling one. The police power would not only be a formidable rival, but, in a struggle, must necessarily triumph over the commercial power, as the power to regulate is dependent upon the power to fix and determine upon the subjects to be regulated. The same process of legislation and reasoning adopted by the State and its courts could bring within the police power any article of consumption that a State might wish to exclude, whether it belonged to that which was drunk, or to food and clothing; and with nearly equal claims to propriety, as malt liquors and the produce of fruits other than grapes stand on no higher ground than the light wines of this and other countries, excluded, in effect, by the law as it now stands. And it would be only another step to regulate real or supposed extravagance in food and clothing."

This question was considered in the case of *Railroad Co.* v. *Husen*, 95 U. S. 465, in which this court declared an act of the legislature of Missouri, which prohibited driving or conveying any Texas, Mexican, or Indian cattle into the State, between the 1st day of March and the 1st day of November of each year, to be in conflict with the constitutional provision investing Congress with power to regulate commerce among the several States, holding that such a statute was more than a quarantine regulation and not a legitimate exercise of the police power of the State. In that case it was said, (p. 472:) "While we unhesitatingly admit that a State may pass sanitary laws, and laws for the protection of life, liberty, health, or property within its borders; while it may prevent persons and animals suffering under contagious or infectious diseases, or convicts, etc., from entering the State; while for the purpose of self-protection it may establish quarantine and reasonable inspection laws, it may not interfere with transportation into or through the State, beyond what is absolutely necessary for its self-protection. It may not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or intestate commerce. . . . The reach of the statute

was far beyond its professed object, and far into the realm which is within the exclusive jurisdiction of Congress. . . . The police power of a State cannot obstruct foreign commerce or interstate commerce beyond the necessity for its exercise; and, under color of it, objects not within its scope, cannot be secured at the expense of the protection afforded by the Federal Constitution. And as its range sometimes comes very near to the field committed by the Constitution to Congress, it is the duty of the courts to guard vigilantly against any needless intrusion."

The same principles were declared in *Henderson* v. *The Mayor of New York*, 92 U. S. 259, and *Chy Lung* v. *Freeman*, 92 U. S. 275. In the latter case, speaking of the right of the State to protect itself from the introduction of paupers and convicted criminals from abroad, the court said, (p. 280:) "Such a right can only arise from a vital necessity for its exercise, and cannot be carried beyond the scope of that necessity." "It may also be admitted," as was said in the case of *Railroad Co.* v. *Husen*, 95 U. S. 465, 471, "that the police power of a State justifies the adoption of precautionary measures against social evils. Under it a state may legislate to prevent the spread of crime, or pauperism, or disturbance of the peace. It may exclude from its limits convicts, paupers, idiots, and lunatics, and persons likely to become a public charge, as well as persons afflicted by contagious or infectious diseases; a right founded, as intimated in *The Passenger Cases*, 7 How. 283, by Mr. Justice Grier, in the sacred law of self-defence. *Vide* 3 Sawyer, 283. The same principle, it may also be conceded, would justify the exclusion of property dangerous to the property of citizens of the State; for example, animals having contagious or infectious diseases. All these exertions of power are in immediate connection with the protection of persons and property against noxious acts of other persons, or such a use of property as is injurious to the property of others. They are self-defensive. But whatever may be the nature and reach of the police power of a State, it cannot be exercised over a subject confided exclusively to Congress by the Federal Constitution. It cannot invade the domain of the national

government. . . . Neither the unlimited powers of a State to tax, nor any of its large police powers, can be exercised to such an extent as to work a practical assumption of the powers properly conferred upon Congress by the Constitution."

It is conceded, as we have already shown, that for the purposes of its policy a State has legislative control, exclusive of Congress, within its territory, of all persons, things, and transactions of strictly internal concern. For the purpose of protecting its people against the evils of intemperance it has the right to prohibit the manufacture within its limits of intoxicating liquors; it may also prohibit all domestic commerce in them between its own inhabitants, whether the articles are introduced from other States or from foreign countries; it may punish those who sell them in violation of its laws; it may adopt any measures tending, even indirectly and remotely, to make the policy effective until it passes the line of power delegated to Congress under the Constitution. It cannot, without the consent of Congress, express or implied, regulate commerce between its people and those of the other States of the Union in order to effect its end, however desirable such a regulation might be.

The statute of Iowa under consideration falls within this prohibition. It is not an inspection law; it is not a quarantine or sanitary law. It is essentially a regulation of commerce among the States within any definition heretofore given to that term, or which can be given; and although its motive and purpose are to perfect the policy of the State of Iowa in protecting its citizens against the evils of intemperance, it is none the less on that account a regulation of commerce. If it had extended its provisions so as to prohibit the introduction into the State from foreign countries of all importations of intoxicating liquors produced abroad, no one would doubt the nature of the provision as a regulation of foreign commerce. Its nature is not changed by its application to commerce among the States.

Can it be supposed, that by omitting any express declarations on the subject, Congress has intended to submit to the several States the decision of the question in each locality of

what shall and what shall not be articles of traffic in the interstate commerce of the country? If so, it has left to each State, according to its own caprice and arbitrary will, to discriminate for or against every article grown, produced, manufactured, or sold in any State and sought to be introduced as an article of commerce into any other. If the State of Iowa may prohibit the importation of intoxicating liquors from all other States, it may also include tobacco, or any other article, the use or abuse of which it may deem deleterious. It may not choose, even, to be governed by considerations growing out of the health, comfort, or peace of the community. Its policy may be directed to other ends. It may choose to establish a system directed to the promotion and benefit of its own agriculture, manufactures or arts of any description, and prevent the introduction and sale within its limits of any or of all articles that it may select as coming into competition with those which it seeks to protect. The police power of the State would extend to such cases, as well as to those in which it was sought to legislate in behalf of the health, peace, and morals of the people. In view of the commercial anarchy and confusion that would result from the diverse exertions of power by the several States of the Union, it cannot be supposed that the Constitution or Congress have intended to limit the freedom of commercial intercourse among the people of the several States. " It cannot be too strongly insisted upon," said this court in *Wabash &c. Railway Co.* v. *Illinois*, 118 U. S. 557, 572, " that the right of continuous transportation from one end of the country to the other is essential in modern times to that freedom of commerce from the restraints which the States might choose to impose upon it, that the commerce clause was intended to secure. This clause, giving to Congress the power to regulate commerce among the States and with foreign nations, as this court has said before, was among the most important of the subjects which prompted the formation of the Constitution. *Cook* v. *Pennsylvania*, 97 U. S. 566, 574 ; *Brown* v. *Maryland*, 12 Wheat. 419, 446. And it would be a very feeble and almost useless provision, but poorly adapted to secure the entire freedom of commerce

among the States, which was deemed essential to a more per-
fect union by the framers of the Constitution, if, at every
stage of the transportation of goods and chattels through the
country, the State, within whose limits a part of the transpor-
tation must be done, could impose regulations concerning the
price, compensation, or taxation, or any other restrictive regu-
lation interfering with and seriously embarrassing this com-
merce."

In *Brown* v. *Houston*, 114 U. S. 622, 630, it was declared
that the power of Congress over commerce among the States
" is certainly so far exclusive that no State has power to make
any law or regulation which will affect the free and unre-
strained intercourse and trade between the States, as Congress
has left it, or which will impose any discriminating burden or
tax upon the citizens or products of other States, coming or
brought within its jurisdiction. All laws and regulations are
restrictive of natural freedom to some extent, and, where no
regulation is imposed by the government which has the exclu-
sive power to regulate, it is an indication of its will that the
matter shall be left free. So long as Congress does not pass
any law to regulate commerce among the several States, it
thereby indicates its will that that commerce shall be free and
untrammeled; and any regulation of the subject by the States
is repugnant to such freedom. This has frequently been laid
down as law in the judgments of this court."

The present case is concluded, we think, by the judgment of
this court in *Walling* v. *Michigan*, 116 U. S. 446. In that
case an act of the legislature of the State of Michigan, which
imposed a tax upon persons who, not residing or having their
principal place of business within the State, engaged there in
the business of selling or soliciting the sale of intoxicating
liquors to be shipped into the State from places without it,
but did not impose a similar tax upon persons selling or solic-
iting the sale of intoxicating liquors manufactured in the State,
was declared to be void on the ground that it was a regulation
in restraint of commerce, repugnant to the Constitution of the
United States. In that case it was said (p. 459): " It is sug-
gested by the learned judge, who delivered the opinion of the

Supreme Court of Michigan in this case, that the tax imposed by the act of 1875 is an exercise, by the legislature of Michigan, of the police power of the State for the discouragement of the use of intoxicating liquors, and the preservation of the health and morals of the people. This would be a perfect justification of the act, if it did not discriminate against the citizens and products of other States in a matter of commerce between the States, and thus usurp one of the prerogatives of the national legislature. The police power cannot be set up to control the inhibitions of the Federal Constitution, or the powers of the United States government created thereby."

It would be error to lay any stress on the fact that the statute passed upon in that case made a discrimination between citizens and products of other States in favor of those of the State of Michigan, notwithstanding the intimation on that point in the foregoing extract from the opinion. This appears plainly from what was decided in the case of *Robbins* v. *Shelby Taxing District*, 120 U. S. 489. It was there said (p. 497): "It is strongly urged, as if it were a material point in the case, that no discrimination is made between domestic and foreign drummers — those of Tennessee and those of other States; that all are taxed alike. But that does not meet the difficulty. Interstate commerce cannot be taxed at all, even though the same amount of tax should be laid on domestic commerce, or that which is carried on solely within the State. This was decided in the case of *The State Freight Tax*, 15 Wall. 232."

In answer to another suggestion in the opinion of the Supreme Court of Michigan, that the regulation contained in the act did not amount to a prohibition, this court said: "We are unable to adopt the views of that learned tribunal as here expressed. It is the power to regulate commerce among the several States which the Constitution in terms confers upon Congress; and this power, as we have seen, is exclusive in cases like the present, where the subject of regulation is one that admits and requires uniformity, and where any regulation affects the freedom of traffic among the States."

The relation of the police powers of the State to the powers

granted to Congress by the Constitution over foreign and interstate commerce, was stated by this court in the opinion in the case of *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 493, as follows: "It is also an established principle, as already indicated, that the only way in which commerce between the States can be legitimately affected by state laws, is when, by virtue of its police power, and its jurisdiction over persons and property within its limits, a state provides for the security of the lives, limbs, health, and comfort of persons, and the protection of property; or when it does those things which may otherwise incidentally affect commerce, such as the establishment and regulation of highways, canals, railroads, wharves, ferries, and other commercial facilities; the passage of inspection laws to secure the due quality and measure of products and commodities; the passage of laws to regulate or restrict the sale of articles deemed injurious to the health or morals of the community; the imposition of taxes upon persons residing within the State or belonging to its population, and upon avocations and employments pursued therein, not directly connected with foreign or interstate commerce, or with some other employment or business exercised under authority of the Constitution and laws of the United States; and the imposition of taxes upon all property within the State mingled with and forming part of the great mass of property therein. But in making such internal regulations, a state cannot impose taxes upon persons passing through the State, or coming into it merely for a temporary purpose, especially if connected with interstate or foreign commerce; nor can it impose such taxes upon property imported into the State from abroad or from another State, and not yet become a part of the common mass of property therein; and no discrimination can be made by any such regulations adversely to the persons or property of other States; and no regulations can be made directly affecting interstate commerce. Any taxation or regulation of the latter character would be an unauthorized interference with the power given to Congress over the subject. . . . In a word, it may be said that in the matter of interstate commerce the United States are but one country, and are and must be sub-

ject to one system of regulations, and not to a multitude of systems. The doctrine of the freedom of that commerce, except as regulated by Congress, is so firmly established that it is unnecessary to enlarge further upon this subject."

The section of the statute of Iowa, the validity of which is drawn in question in this case, does not fall within this enumeration of legitimate exertions of the police power. It is not an exercise of the jurisdiction of the State over persons and property within its limits. On the contrary, it is an attempt to exert that jurisdiction over persons and property within the limits of other States. It seeks to prohibit and stop their passage and importation into its own limits, and is designed as a regulation for the conduct of commerce before the merchandise is brought to its border. It is not one of those local regulations designed to aid and facilitate commerce; it is not an inspection law to secure the due quality and measure of a commodity; it is not a law to regulate or restrict the sale of an article deemed injurious to the health and morals of the community; it is not a regulation confined to the purely internal and domestic commerce of the State; it is not a restriction which only operates upon property after it has become mingled with and forms part of the mass of the property within the State. It is, on the other hand, a regulation directly affecting interstate commerce in an essential and vital point. If authorized, in the present instance, upon the grounds and motives of the policy which have dictated it, the same reason would justify any and every other state regulation of interstate commerce upon any grounds and reasons which might prompt in particular cases their adoption. It is, therefore, a regulation of that character which constitutes an unauthorized interference with the power given to Congress over the subject. If not in contravention of any positive legislation by Congress, it is nevertheless a breach and interruption of that liberty of trade which Congress ordains as the national policy, by willing that it shall be free from restrictive regulations.

It may be said, however, that the right of the State to restrict or prohibit sales of intoxicating liquor within its limits, conceded to exist as a part of its police power, implies the

right to prohibit its importation, because the latter is necessary to the effectual exercise of the former. The argument is that a prohibition of the sale cannot be made effective, except by preventing the introduction of the subject of the sale ; that if its entrance into the State is permitted, the traffic in it cannot be suppressed. But the right to prohibit sales, so far as conceded to the States, arises only after the act of transportion has terminated, because the sales which the State may forbid are of things within its jurisdiction. Its power over them does not begin to operate until they are brought within the territorial limits which circumscribe it. It might be very convenient and useful in the execution of the policy of prohibition within the State to extend the powers of the State beyond its territorial limits. But such extra-territorial powers cannot be assumed upon such an implication. On the contrary, the nature of the case contradicts their existence. For if they belong to one State, they belong to all, and cannot be exercised severally and independently. The attempt would necessarily produce that conflict and confusion which it was the very purpose of the Constitution by its delegations of national power to prevent.

It is easier to think that the right of importation from abroad, and of transportation from one State to another, includes, by necessary implication, the right of the importer to sell in unbroken packages at the place where the transit terminates ; for the very purpose and motive of that branch of commerce which consists in transportation, is that other and consequent act of commerce which consists in the sale and exchange of the commodities transported. Such, indeed, was the point decided in the case of *Brown* v. *Maryland*, 12 Wheat. 419, as to foreign commerce, with the express statement, in the opinion of Chief Justice Marshall, that the conclusion would be the same in a case of commerce among the States. But it is not necessary now to express any opinion upon the point, because that question does not arise in the present case. The precise line which divides the transaction, so far as it belongs to foreign or interstate commerce, from the internal and domestic commerce of the State, we are not

now called upon to delineate. It is enough to say, that the power to regulate or forbid the sale of a commodity, after it has been brought into the State, does not carry with it the right and power to prevent its introduction by transportation from another State.

For these reasons, we are constrained to pronounce against the validity of the section of the statute of Iowa involved in this case. The judgment of the Circuit Court of the United States for the Northern District of Illinois is therefore

*Reversed, and the cause remanded, with instructions to sustain the demurrer to the plea, and to take further proceedings therein in conformity with this opinion.*

Mr. Justice Field, concurring.

I concur in the judgment of the court in this case, and in the greater part of the opinion upon which it is founded.

The opinion clearly shows, as I think, that the law of Iowa prohibiting the importation into that State of intoxicating liquors is an encroachment on the power of Congress over interstate commerce. That commerce is a subject of vast extent. It embraces intercourse between citizens of different States for purposes of trade in any and all its forms, including the transportation, purchase, sale and exchange of commodities. The power to regulate it, which is vested in Congress in the same clause with the power to regulate commerce with foreign nations, is general in its terms. And to regulate this commerce is to prescribe the conditions under which it shall be conducted; that is, how far it shall be free, and how far subject to restrictions. The defendant is a common carrier engaged in the transportation of freight by railway, not only between places in the State of Illinois, but also between places in different States. In the latter business it is, therefore, engaged in interstate commerce. Whatever is an article of commerce it may carry, subject to such regulations as may be necessary for the convenience and safety of the community through which its cars pass, and to insure safety in the carriage of the freight. The law of Iowa prescribing the condi-

tions upon which certain liquors may be imported into that State is, therefore, a regulation of interstate commerce. Such regulation, where the subject, like the transportation of goods, is national in its character, can be made only by Congress, the power which can act for the whole country. Action by the States upon such commerce is not, therefore, permissible. *Mobile* v. *Kimball*, 102 U. S. 691, 697.

What is an article of commerce is determinable by the usages of the commercial world, and does not depend upon the declaration of any State. The State possesses the power to prescribe all such regulations with respect to the possession, use, and sale of property within its limits as may be necessary to protect the health, lives, and morals of its people; and that power may be applied to all kinds of property, even that which in its nature is harmless. But the power of regulation for that purpose is one thing, and the power to exclude an article from commerce by a declaration that it shall not thenceforth be the subject of use and sale, is another and very different thing. If the State could thus take an article from commerce, its power over interstate commerce would be superior to that of Congress, where the Constitution has vested it. The language of Mr. Justice Catron on this subject in *The License Cases*, quoted in the opinion of the court, is instructive. 5 How. 504, 600. Speaking of the assumption by the State of power to declare what shall and what shall not be deemed an article of commerce within its limits, and thus to permit the sale of one and prohibit the sale of the other, without reference to Congressional power of regulation, the learned justice said: "The exclusive state power is made to rest, not on the fact of the state or condition of the article, nor that it is property usually passing by sale from hand to hand, but on the declaration found in the state laws, and asserted as the state policy, that it shall be excluded from commerce. And by this means the sovereign jurisdiction in the State is attempted to be created, in a case where it did not previously exist. If this be the true construction of the constitutional provision, then the paramount power of Congress to regulate commerce is subject to a very material limitation; for it takes

from Congress, and leaves with the States, the power to determine the commodities or articles of property which are the subjects of lawful commerce. Congress may regulate, but the States determine what shall or shall not be regulated. Upon this theory the power to regulate commerce, instead of being paramount over the subject, would become subordinate to the state police power; for it is obvious that the power to determine the articles which may be the subjects of commerce, and thus to circumscribe its scope and operation, is, in effect, the controlling one. The police power would not only be a formidable rival, but, in a struggle, must necessarily triumph over the commercial power, as the power to regulate is dependent upon the power to fix and determine upon the subjects to be regulated."

In *Mugler* v. *Kansas*, recently decided, (123 U. S. 623,) this court held a statute of that State to be valid which prohibited the manufacture and sale within its limits of intoxicating liquors except for medical, scientific, or mechanical purposes, and made a violation of its provisions a misdemeanor punishable by fine or imprisonment. I agreed to so much of the opinion of the court in that case as asserted that there was nothing in the Constitution or laws of the United States which affected the validity of the statute prohibiting the sale of such liquors manufactured in the State, except under proper regulations for the protection of the health and morals of the people. But, at the same time, I stated, without expressing any opinion on the subject, that I was not prepared to say that the State could prohibit the sale of such liquors within its limits under like regulations, if Congress should authorize their importation; observing that the right to import an article of merchandise, recognized as such by the commercial world, whether the right be given by act of Congress or by treaty with a foreign nation, would seem necessarily to carry the right to sell the article when imported. Where the importation is authorized from one State to another a similar right of sale of the article imported would seem to follow. The question upon which I was then unwilling to express an opinion is presented in this case, not in a direct way, it is true,

but in such a form as, it seems to me to require considera-tion.

A statute of Iowa contains a prohibition, similar to that of the Kansas statute, upon the manufacture and sale of intoxicating liquors within its limits, with the additional exception of permission to use them for culinary purposes, and to sell foreign liquors imported under a law of Congress, in the original casks or packages in which they are imported. The law under consideration in this case, prohibiting the importation into Iowa of such liquors from other States, without a license for that purpose, was passed to carry out the policy of the State to suppress the sale of such liquors within its limits. And the argument is pressed with much force that if the State cannot prohibit the importation its policy to suppress the sale will be defeated, and if legislation establishing such policy is not in conflict with the Constitution of the United States, this additional measure to carry the legislation into successful operation must be permissible. The argument assumes that the right of importation carries with it the right to sell the article imported, a position hereafter considered.

The reserved powers of the States in the regulation of their internal affairs must be exercised consistently with the exercise of the powers delegated to the United States. If there be a conflict, the powers delegated must prevail, being so much authority taken from the States by the express sanction of their people; for the Constitution itself declares that laws made in pursuance of it shall be the supreme law of the land. But those powers which authorize legislation touching the health, morals, good order, and peace of their people were not delegated, and are so essential to the existence and prosperity of the States that it is not to be presumed that they will be encroached upon so as to impair their reasonable exercise.

How can these reserved powers be reconciled with the conceded power of Congress to regulate interstate commerce? As said above, the State cannot exclude an article from commerce, and consequently from importation, simply by declaring that its policy requires such exclusion; and yet its regulations respecting the possession, use, and sale of any article of com-

merce may be as minute and strict as required by the nature
of the article, and the liability of injury from it, for the safety,
health and morals of its people.

In the opinion of the court it is stated that the effect of the
right of importation upon the asserted right, as a consequence
thereof, to sell the article imported is not involved in this case,
and therefore it is not necessary to express any opinion on the
subject. The case, it is true, can be decided, and has been de-
cided, without expressing an opinion on that subject; but with
great deference to my associates, I must say that I think its
consideration is presented, and to some extent required, to
meet the argument that the right of importation, because car-
rying the right to sell the article imported, is inconsistent with
the right of the State to prohibit the sale of the article abso-
lutely, as held in the Kansas case. With respect to most sub-
jects of commerce, regulations may be adopted touching their
use and sale when imported, which will afford all the protec-
tion and security desired, without going to the extent of abso-
lute prohibition. It is not found difficult, even with the most
dangerous articles, to provide such minute and stringent
regulations as will guard the public from all harm from
them. Arsenic, dynamite powder, and nitro-glycerine are
imported into every State under such restrictions, as to their
transportation and sale, as to render it safe to deal in them.
There may be greater difficulty in regulating the use and sale
of intoxicating liquors; and I admit that whenever the use of
an article cannot be regulated and controlled so as to insure
the health and safety of society, it may be prohibited and the
article destroyed.

That the right of importation carries with it the right to
sell the article imported does not appear to me doubtful. Of
course I am speaking of an article that is in a healthy condi-
tion, for when it has become putrescent or diseased it has
ceased to be an article of commerce, and it may be destroyed
or its use prohibited. To assert that, under the Constitution
of the United States, the importation of an article of com-
merce cannot be prohibited by the States, and yet to hold that
when imported its use and sale can be prohibited, is to declare

that the right which the Constitution gives is a barren one, to be used only so far as the burden of transportation is concerned, and to be denied so far as any benefits from such transportation are sought. The framers of the Constitution never intended that a right given should not be fully enjoyed. In *Brown* v. *Maryland*, 12 Wheat. 419, 446, Chief Justice Marshall, in delivering the opinion of the court, speaking of the commercial power of Congress, and after observing that it is co-extensive with the subject on which it acts, and cannot be stopped at the exterior boundary of a State, but must enter its interior, said : " If this power reaches the interior of a State, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse ; — one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported ? Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell. . . . The power claimed by the State is, in its nature, in conflict with that given to Congress ; and the greater or less extent in which it may be exercised does not enter into the inquiry concerning its existence. We think, then, that if the power to authorize a sale exists in Congress, the conclusion that the right to sell is connected with the law permitting importation, as an inseparable incident, is inevitable." And the Chief Justice added : " We suppose the principles laid down in this case to apply equally to importations from a sister State." p. 449.

Assuming, therefore, as correct doctrine that the right of importation carries the right to sell the article imported, the

decision in the Kansas case may perhaps be reconciled with the one in this case by distinguishing the power of the State over property created within it, and its power over property imported — its power in one case extending, for the protection of the health, morals, and safety of its people, to the absolute prohibition of the sale or use of the article, and in the other extending only to such regulations as may be necessary for the safety of the community until it has been incorporated into and become a part of the general property of the State. However much this distinction may be open to criticism, it furnishes, as it seems to me, the only way in which the two decisions can be reconciled.

There is great difficulty in drawing the line precisely where the commercial power of Congress ends and the power of the State begins. The same difficulty was experienced in *Brown* v. *Maryland*, in drawing a line between the restriction on the States to lay a duty on imports and their acknowledged power to tax persons and property. In that case the court said that the two, the power and the restriction, though distinguishable when they did not approach each other, might, like the intervening colors between white and black, approach so nearly as to perplex the understanding as colors perplex the vision, in marking the distinction between them : but as the distinction existed, it must be marked as the cases arise. And after observing that it might be premature to state any rule as being universal in its application, the court held as sufficient for that case that when the importer had so acted upon the thing imported, that it had become incorporated and mixed up with the mass of property in the country, it had lost its distinctive character as an import, and had become subject to the taxing power of the state ; but that while remaining the property of the importer, in his warehouse in the original form or package in which it was imported, a tax upon it was plainly a duty on imports.

So in the present case it is perhaps impossible to state any rule which would determine in all cases where the right to sell an imported article under the commercial power of the Federal government ends and the power of the state to restrict

further sale has commenced.   Perhaps no safer rule can be adopted than the one laid down in *Brown* v. *Maryland*, that the commercial power continues until the articles imported have become mingled with and incorporated into the general property of the State, and not afterwards.   And yet it is evident that the value of the importation will be materially affected, if the article imported ceases to be under the protection of the commercial power upon its sale by the importer.   There will be little inducement for one to purchase from the importer, if immediately afterwards he can himself be restrained from selling the article imported; and yet the power of the State must attach when the imported article has become mingled with the general property within its limits, or its entire independence in the regulation of its internal affairs must be abandoned.   The difficulty and embarrassment which may follow must be met as each case arises.

In *The License Cases*, reported in 5 Howard, this court held that the States could not only regulate the sales of imported liquors, but could prohibit their sale.   The judges differed in their views in some particulars, but the majority were of opinion that the States had authority to legislate upon subjects of interstate commerce until Congress had acted upon them; and as Congress had not acted, the regulation of the States was valid.   The doctrine thus declared has been modified since by repeated decisions.   The doctrine now firmly established is, that where the subject upon which Congress can act under its commercial power is local in its nature or sphere of operation, such as harbor pilotage, the improvement of harbors, the establishment of beacons and buoys to guide vessels in and out of port, the construction of bridges over navigable rivers, the erection of wharves, piers, and docks, and the like, which can be properly regulated only by special provisions adapted to their localities, the State can act until Congress interferes and supersedes its authority; but where the subject is national in its character, and admits and requires uniformity of regulation, affecting alike all the States, such as transportation between the States, including the importation of goods from one State into another, Congress can alone act upon it and provide the

needed regulations.   The absence of any law of Congress on
the subject is equivalent to its declaration that commerce in
that matter shall be free.   Thus the absence of regulations as
to interstate commerce with reference to any particular sub-
ject is taken as a declaration that the importation of that
article into the States shall be unrestricted.   It is only after
the importation is completed, and the property imported has
mingled with and become a part of the general property of
the State, that its regulations can act upon it, except so far as
may be necessary to insure safety in the disposition of the im-
port until thus mingled.   *Cooley* v. *Board of Wardens of the
Port of Philadelphia*, 12 How. 299, 319; *State Freight Tax
Case*, 15 Wall. 232, 271; *Welton* v. *Missouri*, 91 U. S. 275,
282; *Railroad Co.* v. *Husen*, 95 U. S. 465, 469; *Mobile* v
*Kimball*, 102 U. S. 691, 697; *Gloucester Ferry Co.* v. *Penn-
sylvania*, 114 U. S. 196, 203; *Brown* v. *Houston*, 114 U. S. 622,
631; *Walling* v. *Michigan*, 116 U. S. 446, 455; *Pickard* v.
*Pullman Southern Car Co.*, 117 U. S. 34; *Wabash &c. Rail-
way Co.* v. *Illinois*, 118 U. S. 557; *Robbins* v. *Shelby County
Taxing District*, 120 U. S. 489.

It is a matter of history that one of the great objects of the
formation of the Constitution was to secure uniformity of com-
mercial regulations, and thus put an end to restrictive and hos-
tile discriminations by one State against the products of other
States, and against their importation and sale.   "It may be
doubted," says Chief Justice Marshall, "whether any of the
evils proceeding from the feebleness of the Federal govern-
ment contributed more to that great revolution which intro-
duced the present system than the deep and general conviction
that commerce ought to be regulated by Congress.   It is not,
therefore, matter of surprise that the grant should be as ex-
tensive as the mischief, and should comprehend all foreign
commerce and all commerce among the States.   To construe
the power so as to impair its efficacy would tend to defeat an
object, in the attainment of which the American government
took, and justly took, that strong interest which arose from
a full conviction of its necessity."   *Brown* v. *Maryland*, 12
Wheat. 446.   To these views I may add, that if the States

have the power asserted, to exclude from importation within their limits any articles of commerce because in their judgment the articles may be injurious to their interests or policy, they may prescribe conditions upon which such importation will be admitted, and thus establish a system of duties as hostile to free commerce among the states as any that existed previous to the adoption of the Constitution.

MR. JUSTICE HARLAN, with whom concurred THE CHIEF JUSTICE, and MR. JUSTICE GRAY, dissenting.

The Chief Justice, Mr. Justice Gray, and myself are unable to assent to the opinion and judgment of the court.

The effect of the statutes of Iowa is to forbid the introduction of intoxicating liquors from other States for sale, except for medicinal, mechanical, culinary, or sacramental purposes. They may be brought in for such purposes, by any person, or carrier, for another person or corporation, if consigned to some one authorized by the laws of Iowa to buy and sell intoxicating liquors. And these statutes permit the sale of foreign intoxicating liquors, imported under the laws of the United States, provided such sale is by the importer, in the original casks or packages, and in quantities not less than those in which they are required to be imported.

It appears upon the face of the declaration that the plaintiffs — one of whom is a citizen of Iowa — made application to the board of supervisors of Marshall County, in that State, for permission, under the statute, to buy and sell in that county intoxicating liquors for medicinal, culinary, mechanical, and sacramental purposes, and that their application was rejected. They then resorted to the expedient of buying five thousand barrels of beer in Chicago, and tendering them to the railroad company for transportation to the same county, without furnishing the certificate required by the laws of Iowa. The refusal of the company to transport this beer into Iowa, in violation of her laws, is the basis of the present suit. The plaintiffs claim damages upon the ground that they could have sold this beer in that State at a price in advance of what

it cost them.   As they do not allege that the beer was to be delivered in Iowa to a person authorized by her laws to sell it there, no wrong was done, of which the plaintiffs can complain, unless it be their right, not only to have their beer carried into the State, but to sell it there, in defiance of her laws.

The fundamental question, therefore, is, whether Iowa may lawfully restrict the bringing of intoxicating liquors from other States into her limits, by any person or carrier, for another person or corporation, except such as are consigned to persons authorized by her laws to buy and sell them for the special purposes indicated.   In considering this question, we are not left to conjecture as to the motives prompting the enactment of these statutes ; for, it is conceded, that the prohibition upon common carriers bringing intoxicating liquors from other States, except under the foregoing conditions, was adopted as subservient to the general design of protecting the health and morals and the peace and good order of the people of Iowa against the physical and moral evils resulting from the unrestricted manufacture or sale of intoxicating liquors.

In *Mugler* v. *Kansas*, 123 U. S. 623, it was adjudged that state legislation prohibiting the manufacture of intoxicating liquors, to be sold or bartered for general use as a beverage, did not necessarily infringe any right, privilege, or immunity secured by the Constitution of the United States ; and that the former decisions to that effect — *License Cases*, 5 How. 504 ; *Bartemeyer* v. *Iowa*, 18 Wall. 129 ; *Beer Co.* v. *Massachusetts*, 97 U. S. 25, 33 ; and *Foster* v. *Kansas*, 112 U. S. 201, 206 — " rest upon the acknowledged right of the States of the Union to control their purely internal affairs, and, in so doing, to protect the health, morals, and safety of their people by regulations that do not interfere with the execution of the powers of the general government, or violate rights secured by the Constitution.   The power to establish such regulations, as was said in *Gibbons* v. *Ogden*, 9 Wheat. 1, 203, reaches everything within the territory of a State not surrendered to the national government."   123 U. S. 659.   Referring to the suggestion that no government could lawfully prohibit a citizen from

manufacturing for his own use, or for export or storage, any article of food or drink, not endangering or affecting the rights of others, the court said: "But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety." 123 U. S. 660, 661.

But it is contended that a statute forbidding the introduction of intoxicating liquors from other States, does infringe rights secured by the Constitution of the United States; and that view is sustained by the opinion and judgment in this case. The decision is placed upon the broad ground that intoxicating liquors are merchantable commodities, or known articles of commerce, and that, consequently, the Constitution, by the mere grant to Congress of the power to regulate commerce operates, in the absence of legislation, to establish unrestricted trade, among the States of the Union, in such commodities or articles. To this view we cannot assent. In Mugler's case the court said that it could not "shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety may be endangered by the general use of intoxicating drinks; nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country are, in some degree at least, traceable to this evil." The court also said, that "if, in the judgment of the legislature [of a State] the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if not

defeat, the effort to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their view as to what is best and safest for the community, to disregard the legislative determination of that question. . . . Nor can it be said that government interferes with or impairs any one's constitutional rights of liberty or of property, when it determines that the manufacture and sale of intoxicating drinks for general or individual use, as a beverage, are or may become hurtful to society, and constitute, therefore, a business in which no one may lawfully engage." 123 U. S. 662, 663.

In *Gibbons* v. *Ogden*, 9 Wheat. 1, 203, 205, Chief Justice Marshall said that "inspection laws, quarantine laws, and health laws of every description" were component parts of that mass of legislation, "not surrendered to the general government," which "can be most advantageously exercised by the States themselves;" that such laws "are considered as flowing from the acknowledged power of a State to provide for the health of its citizens." To this doctrine the court has steadily adhered. In *Gilman* v. *Philadelphia*, 3 Wall. 713, 730, after observing that a state law, requiring an importer to pay for and take out a license before he should be permitted to sell a bale of goods imported from a foreign country, is void, (*Brown* v. *Maryland*, 12 Wheat. 419,) and that a state law which requires the master of a vessel, engaged in foreign commerce, to pay a certain sum to a state officer on account of each passenger brought from a foreign country, is also void, (*Passenger Cases*, 7 How. 273,) the court said: "But a State, in the exercise of its police power, may forbid spirituous liquor, imported from abroad or from another State, to be sold by retail or to be sold at all without a license; and it may visit the violation of the prohibition with such punishment as it may deem proper. Under quarantine laws, a vessel registered, or enrolled and licensed, may be stopped before entering her port of destination, or be afterwards removed and detained elsewhere for an indefinite period; and a bale of goods, upon which the duties have or have not been paid, laden with infection, may be seized under 'health laws,'

and, if it cannot be purged of its poison, may be committed to the flames." In *Sherlock* v. *Alling*, 93 U. S. 99, 103, it was said that " in conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." In *Railroad Co.* v. *Husen*, 95 U. S. 465, 471, the court adjudged that a statute of Missouri, prohibiting the introduction into that State of all Texas, Mexican, or Indian cattle between May 1 and November 1 of each year, whether diseased or not, and which imposed burdensome conditions upon their transportation through the State, was void because a regulation of interstate commerce. But it was distinctly declared that the delegation to Congress of the power to regulate commerce with foreign nations and among the States " was not a surrender of that which may properly be denominated police power," which included, the court said, the power, in each State, to adopt " precautionary measures against social evils"; to " prevent the spread of crime or pauperism, or disturbance of the peace"; to " exclude from its limits convicts, paupers, idiots, and lunatics, and persons likely to become a public charge, as well as persons afflicted by contagious or infectious diseases"; and to exclude " property dangerous to the property of citizens of the State; for example, animals having contagious or infectious diseases." " All these," it was said, "are in immediate connection with the protection of persons and property against noxious acts of other persons, or such use of property as is injurious to the property of others; they are self-defensive." It was only because the Missouri statute embraced cattle that were free from disease, that it was declared unconstitutional. In *Patterson* v. *Kentucky*, 97 U. S. 501, 505, the principle was affirmed that the police power of the States was not surrendered, when authority was conferred upon Congress to regulate commerce with foreign nations, and among the States.

It seems to us that the decision just rendered does not conform to the doctrines of the foregoing cases, and may impair,

if it does not destroy, the power of a State to protect her people against the injurious consequences that are admitted to flow from the general use of intoxicating liquors. It was said in *Brown* v. *State of Maryland*, 12 Wheat. 419, 439, 441: "There is no difference, in effect, between a power to prohibit the sale of an article and a power to prohibit its introduction into the country. . . . When the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution." Considering the question in that case, under the power of Congress to regulate commerce, the court said: "Sale is the object of importation, and is an essential ingredient in that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce." p. 447. Although there was no question in that case as to commerce among the States, the court further said: "We suppose the principles laid down in this case to apply equally to importations from a sister State." p. 449. If, therefore, as the court now decides, the Constitution gives the right to transport intoxicating liquors into Iowa from another State, and if that right carries with it, as one of its essential ingredients, authority, in the consignee, to sell or exchange such articles, after they are so brought in, and while in his possession, in the original packages, it is manifest that the regulation forbidding sales of intoxicating liquors, within the State, for other than medicinal, mechanical, culinary, or sacramental purposes, and then only under a permit from a board of supervisors, will be of little practical value. In this view, any one — even a citizen of Iowa — desiring to sell intoxicating liquors in that State, need only arrange to have them delivered to him from some point in another State, in

packages of varying sizes, as may suit customers. Or, he may erect his manufacturing establishment, or warehouse, just across the Iowa line, in some State having a different public policy, and thence, with wagons, transport liquors into Iowa, in original packages. If the State arraigns him for a violation of her laws, he may claim — and, under the principles of the present decision, it may become difficult to dispute the claim — that, although such laws were enacted solely to protect the health and morals of the people, and to promote peace and good order among them, and although they are fairly adapted to accomplish those objects, yet the Constitution of the United States, without any action upon the part of Congress, secures to him the right to bring or receive from other States intoxicating liquors in original packages, and to sell them, while held by him in such packages, to all choosing to buy them. Thus, the mere silence of Congress upon the subject of trade among the States in intoxicating liquors is made to operate as a license to persons doing business in one State to jeopard the health, morals, and good order of another State, by flooding the latter with intoxicating liquors, against the express will of her people.

It is admitted that a State may prevent the introduction within her limits of rags or other goods infected with disease, or of cattle or meat, or other provisions which, from their condition, are unfit for human use or consumption; because, it is said, such articles are not merchantable or legitimate subjects of trade and commerce. But suppose the people of a State believe, upon reasonable grounds, that the general use of intoxicating liquors is dangerous to the public peace, the public health, and the public morals, what authority has Congress or the judiciary to review their judgment upon that subject, and compel them to submit to a condition of things which they regard as destructive of their happiness and the peace and good order of society? If, consistently with the Constitution of the United States, a State can protect her sound cattle by prohibiting altogether the introduction within her limits of diseased cattle, she ought not to be deemed disloyal to that Constitution when she seeks by similar legislation to protect

her people and their homes against the introduction of articles which are, in good faith, and not unreasonably, regarded by her citizens as "laden with infection." more dangerous to the public than diseased cattle, or than rags containing the germs of disease.

It is not a satisfactory answer to these suggestions, to say that if the State may thus outlaw the manufacture and sale of intoxicating liquors, as a beverage, and exclude them from her limits, she may adopt the same policy with reference to articles that confessedly have no necessary or immediate connection with the health, the morals, or the safety of the community, but are proper subjects of trade the world over. This possible abuse of legislative power was earnestly dwelt upon by the counsel in *Mugler's Case.* The same argument can be, as it often is, made in reference to powers that all concede to be vital to the public safety. But it does not disprove their existence. This court said that the judicial tribunals were not to be misled by mere pretences, and were under a solemn duty to look at the substance of things whenever it became necessary to inquire whether the legislature had transcended the limits of its authority ; and that, " if, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." 123 U. S. 661. In view of these principles, the court said it was difficult to perceive any ground for the judiciary to declare that the prohibition by a State of the manufacture or sale, within her limits, of intoxicating liquors for general use there as a beverage, is not fairly adapted to the end of protecting the community against the evils which confessedly result from the excessive use of ardent spirits. *Id.* 662. In the same case the court sustained, without qualification, the authority of Kansas to declare, not only that places where such liquors were manufactured, sold, bartered, or given away, or were kept for sale, barter, or delivery, in violation of her statutes, should be deemed common nuisances, but to provide

for the forfeiture, without compensation, of the intoxicating liquors found in such places and the property used in maintaining said nuisances.

Now, can it be possible that the framers of the Constitution intended — whether Congress chose or not to act upon the subject — to withhold from a State authority to prevent the introduction into her midst of articles or commodities, the manufacture of which, within her limits, she could prohibit, without impairing the constitutional rights of her own people? If a State may declare a place where intoxicating liquors are sold for use as a beverage to be a common nuisance, subjecting the person maintaining the same to fine and imprisonment, can her people be compelled to submit to the sale of such liquors, when brought there from another State for that purpose? This court has often declared that the most important function of government was to preserve the public health, morals, and safety; that it could not divest itself of that power, nor, by contract, limit its exercise; and that even the constitutional prohibition upon laws impairing the obligation of contracts does not restrict the power of the State to protect the health, the morals, or the safety of the community, as the one or the other may be involved in the execution of such contracts. *Stone* v. *Mississippi*, 101 U. S. 814, 816; *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746, 751; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 672; *Mugler* v. *Kansas*, 123 U. S. 623, 664. Does the mere grant of the power to regulate commerce among the States invest individuals of one State with the right, even without the express sanction of Congressional legislation, to introduce among the people of another State articles which, by statute, they have declared to be deleterious to their health and dangerous to their safety? In our opinion, these questions should be answered in the negative. It is inconceivable that the well-being of any State is at the mercy of the liquor manufacturers of other States.

These views are sustained by *Walling* v. *Michigan*, 116 U. S. 446. It was there held that a statute of Michigan which imposed a tax upon persons who, not residing or having their

principal place of business in that State, engaged there in the business of selling or soliciting the sale of intoxicating liquors to be shipped into Michigan from other States, but which did not impose a similar tax upon persons selling or soliciting the sale of intoxicating liquors manufactured in that State, was a discrimination against the products of other States, and void as a regulation in restraint of commerce. In reference to the suggestion by the state court that the statute was an exercise by the legislature of the police power for the discouragement of the use of intoxicating liquors, and the preservation of the health and morals of the people, this court said: "This would be a perfect justification of the act if it did not discriminate against the citizens and products of other States in a matter of commerce between the States, and thus usurp one of the prerogatives of the national legislature." p. 460. The clear implication from this language is that the state law would have been sustained if it had applied the same rule to the products of Michigan which it attempted to apply to the products of other States.

At the argument it was insisted that the contention of the plaintiffs was supported by *Brown* v. *Maryland*, 12 Wheat. 419, 436, where the question was whether the legislature of a State could constitutionally require an importer of foreign articles or commodities to take out a license from the State before he should be permitted to sell a bale or package so imported. The indictment in that case charged Brown with having sold one package of foreign "dry goods" without having such a license. The court held the state regulation to be repugnant to that clause of the Constitution declaring that no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, as well as to that clause which clothes Congress with power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes. Among other things, it said that the right to sell articles imported from foreign countries is connected with the law permitting importation, as an inseparable incident; observing, at the close of the

opinion that it supposed the principle laid down to apply equally to importations from a sister State. It is, however, clear from the whole opinion that the court in that observation had reference to commerce in articles having no connection whatever with the health, morals, or safety of the people, and that it had no purpose to withdraw or qualify the explicit declaration, in *Gibbons* v. *Ogden*, that the health laws of the States were a component part of that mass of legislation, the power to enact which remained with the States, because never surrendered to the general government. In behalf of Maryland it was insisted that the constitutional prohibition of state imposts or duties upon imports ceased the instant the goods entered the country; otherwise, it was argued, the importer " may introduce articles, as gunpowder, which endanger a city, into the midst of its population; he may introduce articles which endanger the public health, and the power of self-preservation is denied." To this argument Chief Justice Marshall replied: " The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States. If the possessor stores it himself out of town, the removal cannot be a duty on imports, because it contributes nothing to the revenue. If he prefers placing it in a public magazine, it is because he stores it there, in his own opinion, more advantageously than elsewhere. We are not sure that this may not be classed among inspection laws. The removal or destruction of infectious or unsound articles is undoubtedly an exercise of that power, and forms an express exception to the prohibition we are considering. Indeed, the laws of the United States expressly recognize the health laws of a State." This, we understand to have been a distinct readjudication that the police power, so far as it involves the public health, the public morals, or the public safety, remains with the States, and is not overridden by the National Constitution.

In *Gibbons* v. *Ogden*, it was said by counsel that the Constitution does not confer the right of intercourse between State and State, and that such right has its source in those laws whose authority is acknowledged by civilized man throughout

the world. Chief Justice Marshall said: "This is true. The Constitution found it an existing right, and gave to Congress the power to regulate it." 9 Wheat. 211. In the same case he said that this power is "the power to regulate; that is, to prescribe the rule by which commerce is to be governed." p. 196. It may be said, generally, that free commercial intercourse exists among the several States by force of the Constitution. But as, by the express terms of that instrument, the powers not delegated to the United States, nor prohibited to the States, are reserved to the States respectively, or to the people, and as, by the repeated adjudications of this court, the States have not surrendered, but have reserved, the power, to protect, by police regulations, the health, morals, and safety of their people, Congress may not prescribe any rule to govern commerce among the States which prevents the proper and reasonable exercise of this reserved power. Even if Congress, under the power to regulate commerce, had authority to declare what shall or what shall not be subjects of commerce among the States, that power would not fairly imply authority to compel a State to admit within her limits that which, in fact is, or which, upon reasonable grounds, she may declare to be destructive of the health, morals, and peace of her people. The purpose of committing to Congress the regulation of commerce was to insure equality of commercial facilities, by preventing one State from building up her own trade at the expense of sister States. But that purpose is not defeated when a State employs appropriate means to prevent the introduction into her limits of what she lawfully forbids her own people from making. It certainly was not meant to give citizens of other States greater rights in Iowa than Iowa's own people have.

But if this be not a sound interpretation of the Constitution; if intoxicating liquors are entitled to the same protection by the National Government as ordinary merchandise entering into commerce among the States; if Congress, under the power to regulate commerce, may, in its discretion, permit or prohibit commerce among the States in intoxicating liquors; and, if, therefore, state police power, as the health,

morals, and safety of the people may be involved in its proper
exercise, can be overborne by national regulations of com-
merce, the former decisions of this court would seem to show
that such laws of the States are valid, even where they affect
commercial intercourse among the States, until displaced by
Federal legislation, or until they come in direct conflict with
some act of Congress. Such was the doctrine announced in
*Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245. That case
involved the validity of an act of the legislature of Delaware,
authorizing a dam to be built across a navigable stream, in
which the tide ebbed and flowed, and in which there was a
common and public way in the nature of a highway. The
court, speaking by Chief Justice Marshall, said: " The act of
assembly, by which the plaintiffs were authorized to construct
their dam, shows plainly that this is one of those many creeks,
passing through a deep level marsh adjoining the Delaware,
up which the tide flows for some distance. The value of the
property on its banks must be enhanced by excluding the
water from the marsh, and the health of the inhabitants prob-
ably improved. Measures calculated to produce these objects,
provided they do not come into collision with the powers of
the General Government, are undoubtedly within those which
are reserved to the States. But the measure authorized by
this act stops a navigable creek, and must be supposed to
abridge the rights of those who have been accustomed to use
it." p. 251. The counsel having insisted that the statute
came in conflict with the power of Congress to regulate com-
merce with foreign nations and among the several States, the
court said: " If Congress had passed any act which bore on
this case, any act in execution of the power to regulate com-
merce, the object of which was to control state legislation
over small navigable creeks into which the tide flows, and
which abound throughout the lower country of the middle and
southern States, we should not feel much difficulty in saying
that a state law coming in conflict with such act would be
void. But Congress has passed no such act. The repugnancy
of the law of Delaware to the Constitution is placed entirely
on its repugnancy to the power to regulate commerce with

foreign nations and among the several States; a power which has not been so exercised as to affect the question." The same principle is announced in many other cases. *Gilman* v. *Philadelphia*, 3 Wall. 713; *Escanaba Co.* v. *Chicago*, 107 U. S. 678; *Cardwell* v. *American Bridge Co.*, 113 U. S. 205; *Hamilton* v. *Vicksburg &c. Railroad*, 119 U. S. 280; *Huse* v. *Glover*, 119 U. S. 543, 546. These were all cases of the erection of bridges and other structures within the limits of States, and under their authority, across public navigable waters of the United States. They were held not to be forbidden by the Constitution, although such structures actually interfered with interstate commerce. In *Gilman* v. *Philadelphia* and *Cardwell* v. *American Bridge Co.*, the bridges were without draws, entirely preventing the passage of boats to points, in one case, where the tide ebbed and flowed, and, in both cases, to points where commerce had been previously carried on. In *Hamilton* v. *Vicksburg &c. Railroad*, the court said: "What the form and character of the bridges should be, that is to say, of what height they should be erected, and of what materials constructed, and whether with or without draws, were matters for the regulation of the State, subject only to the paramount authority of Congress to prevent any unnecessary obstruction to the free navigation of the streams. Until Congress intervenes in such cases, and exercises its authority, the power of the State is plenary. When the State provides for the form and character of the structure its directions will control, except as against the action of Congress, whether the bridge be with or without draws, and irrespective of its effect upon navigation." p. 281.

But, perhaps, the language of this court — all the judges concurring — which most directly bears upon the question before us, is found in *County of Mobile* v. *Kimball*, 102 U. S. 691, 701, reaffirming *Willson* v. *Blackbird Creek Marsh Company*. It was there said: "In *The License Cases*, (5 How. 504,) which were before the court in 1847, there was great diversity of views in the opinions of the different judges upon the operation of the grant of the commercial power of Congress in the absence of Congressional legislation. Extreme

doctrines upon both sides of the question were asserted by some of the judges, but the decision reached, so far as it can be viewed as determining any question of construction, was confirmatory of the doctrine that legislation of Congress is essential to prohibit the action of the States upon the subject thus considered." This language is peculiarly significant in view of the fact that in one of the License Cases — *Pierce* v. *New Hampshire*, 5 How. 504, 557, 578 — the question was as to the validity of an act of that State, under which Pierce was indicted, convicted, and fined, for having sold, without a local town license, a barrel of gin, which he purchased in Boston, transported to Dover, New Hampshire, and there sold in the identical cask in which it was carried to that State from Massachusetts.

In harmony with these principles the court affirmed at the present term, in *Smith* v. *State of Alabama*, 124 U. S. 465, the validity of a statute of that State, making it unlawful for a locomotive engineer, even when his train is employed in interstate commerce, to drive or operate any train of cars upon a railroad in that State, used for the transportation of persons, passengers, or freight, without first undergoing an examination by, and obtaining a license from, a board of engineers appointed by the governor of Alabama. If a train of cars passed through that State to New Orleans, the engineer, however well qualified for his station, if not licensed by that local board, was subject to be fined not less than fifty nor more than five hundred dollars, and sentenced to hard-labor for the county, for not more than six months. The court held that this statute "is not, considered in its own nature, a regulation of interstate commerce"; that "it is properly an act of legislation within the scope of the admitted power reserved to the States to regulate the relative rights and duties of persons, being and acting within its territorial jurisdiction, intended to operate so as to secure for the public safety of person and property"; and that "so far as it affects transactions of commerce among the States, it does so only indirectly, incidentally, and remotely, and not so as to burden or impede them, and in the particulars on which it touches those transactions at all it

is not in conflict with any express enactment of Congress on the subject, nor contrary to any intention of Congress to be presumed from its silence." Until Congress, by legislation, prescribed the qualification of locomotive engineers employed by railroad companies engaged in the transportation of passengers and goods among the States, Alabama, it was adjudged, could fix the qualifications of such engineers, even when running in that State trains employed in interstate commerce.

.It would seem that if the Constitution of the United States does not, by its own force, displace or annul a state law, authorizing the construction of bridges or dams across public navigable waters of the United States, thereby wholly preventing the passage of vessels engaged in interstate commerce upon such waters, the same Constitution ought not to be held to annul or displace a law of one of the States which, by its operation, forbids the bringing within her limits, from other States, articles which that State, in the most solemn manner, has declared to be injurious to the health, morals, and safety of her people. The silence of Congress upon the subject of interstate commerce, as affected by the police laws of the States, enacted in good faith to promote the public health, the public morals, and the public safety, and to that end prohibiting the manufacture and sale, within their limits, of intoxicating liquors to be used as a beverage, ought to have, at least, as much effect as the silence of Congress in reference to physical obstructions placed, under the authority of a State, in a navigable water of the United States. The reserved power of the States to guard the health, morals, and safety of their people is more vital to the existence of society, than their power in respect to trade and commerce having no possible connection with those subjects.

For these reasons, we feel constrained to dissent from the opinion and judgment of the court.

MR. JUSTICE LAMAR was not present at the argument of this case, and took no part in its decision.