HACKENSACK MEADOWLANDS DEVELOPMENT COMMIS-
SION AND STATE OF NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL PROTECTION, PLAINTIFFS-AP-
PELLANTS, v. MUNICIPAL SANITARY LANDFILL AU-
THORITY, A JOINT VENTURE OF WILLIAM A. KEE-
GAN, INC., RECLAMATION AND IMPROVEMENT CO.,
PETER ROSELLE & SONS, INC. AND DELAWARE SAN-
ITARY CO., DEFENDANTS-RESPONDENTS, AND CITY
OF YONKERS, NEW YORK, DEFENDANT-INTERVENOR-
RESPONDENT.

CITY OF PHILADELPHIA, ETC., ET ALS, PLAINTIFFS-RE-
SPONDENTS, AND JOHN P. FAZZIO LANDFILL, INC.,
T/A JOHN P. FAZZIO LANDFILL CO., ET AL, PLAIN-
TIFFS-INTERVENORS-RESPONDENTS, v. STATE OF
NEW JERSEY, ET AL, DEFENDANTS-APPELLANTS.

Argued December 2, 1974—Decided November 18, 1975.

454

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for defendants-appellants (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Skillman,* of counsel; *Mr. Mark L. First,* Deputy Attorney General, on the brief).

*Mr. Herbert F. Moore* argued the cause for plaintiffs-respondents, City of Philadelphia, etc., et al (*Messrs. Jamieson, Walsh, McCardell, Moore and Peskin,* attorneys; *Mr. Moore,* of counsel; *Mr. Arthur Meisel,* on the brief).

*Mr. Vincent J. Dotoli* argued the cause for plaintiffs-intervenors-respondents, John P. Fazzio, Inc., t/a John P. Fazzio Landfill Co., et al.

*Mr. David Samson* argued the cause for defendants-respondents, Municipal Sanitary Landfill Authority, etc. (*Messrs. Leib, Wolff and Samson,* attorneys).

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for plaintiffs-appellants (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Skillman,* of counsel; *Mr. Mark L. First,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

MOUNTAIN, J. These proceedings involve the joint review of two separate cases. In one case the judgment was entered pursuant to an opinion rendered in *Hackensack Meadowlands Development Commission v. Municipal Sanitary Landfill Authority,* 127 *N. J. Super.* 160 (Ch. Div. 1974). In the other, judgment was entered following the rendition of an oral opinion in a suit brought by the City of Philadelphia, together with the owners of several landfill operations in South Jersey, against the State of New Jersey and its Department of Environmental Protection (DEP). The

cumulative effect of these two judgments was to render unconstitutional certain sections of the Waste Control Act, *N. J. S. A.* 13:1I–1 *et seq.,* together with regulations promulgated by DEP and by the Hackensack Meadowlands Development Commission (HMDC). The measures declared unconstitutional had as their purpose the exclusion from this State of solid waste originating elsewhere. In each suit the trial court found that the laws and regulations under review violated the Commerce Clause, Article I, § 8, clause 3, of the United States Constitution.

I

The comprehensive authority and responsibility delegated by the Legislature to the HMDC in the Hackensack Meadowlands Reclamation and Development Act, *N. J. S. A.* 13:17–1 *et seq.,* includes the power to provide facilities for the treatment and disposal of solid waste. *N. J. S. A.* 13:17–6(w), 13:17–10. The Waste Control Act, *N. J. S. A.* 13:1I–1 *et seq.,* as originally enacted, contained a legislative finding "that the quality of New Jersey's environment is being threatened by the treatment and disposal of wastes generated or collected outside the State . . ." *N. J. S. A.* 13:1I–2. By amendments to this act that became effective early in 1974, the Legislature further found that the whole problem of solid waste disposal was growing increasingly acute and that it continued to be seriously exacerbated by the importation of waste from without the State; it determined to and did forbid that any further such waste be brought into the State.[1] The Waste Control Act also authorized and directed

---

[1]The Legislature finds and determines that since the enactment of P. L. 1973, c. 39 (C. 13:1I–1 et seq.) the volume of solid and liquid waste continues to rapidly increase, that the treatment and disposal of these wastes continues to pose an even greater threat to the quality of the environment of New Jersey, that the available and appropriate land fill sites within the State are being diminished, that the environment continues to be threatened by the treatment

the DEP to promulgate rules and regulations "prohibiting . . . the incineration or landfill of solid waste and the treatment or disposal of liquid wastes within the State which originated or were collected outside the territorial limits of the State." *N. J. S. A.* 13:1I-4. Both HMDC and DEP promulgated regulations responsive to these legislative enactments, all looking to bar the importation of solid and liquid waste from outside the State.[2]

and disposal of waste which originated or was collected outside the State, and that the public health, safety and welfare require that the treatment and disposal within this State of all wastes generated outside of the State be prohibited. [*N. J. S. A.* 13:1I-9]

No person shall bring into this State any solid or liquid waste which originated or was collected outside the territorial limits of the State, except garbage to be fed to swine in the State of New Jersey, until the commissioner [Commissioner of Environmental Protection] shall determine that such action can be permitted without endangering the public health, safety and welfare and has promulgated regulations permitting and regulating the treatment and disposal of such waste in this State. Any person violating this provision shall be subject to the penalty and enforcement provisions of the "Waste Control Act," P. L. 1973. c. 39. [*N. J. S. A.* 13:1I-10]

[2]The pertinent portions of the HMDC regulation, which became effective September 1, 1973, read as follows:

(g) No solid waste originating or collected outside of the territorial jurisdiction of New Jersey shall be disposed of or treated within the Hackensack Meadowlands District. No sanitary landfill operator shall accept for disposal, at a sanitary landfill within the Hackensack Meadowlands District, any solid waste originating or collected outside of the territorial limits of New Jersey.

(h) All operators of sanitary landfills within the Hackensack Meadowlands District shall submit to the Commission [Hackensack Meadowlands Development Commission] . . . a certification stating that no solid waste originating or collected outside of the territorial limits of New Jersey will be accepted for disposal or treatment. [*N. J. A. C.* 19:7-1.1]

The regulation of the DEP in its present form became effective February 1, 1974 and reads as follows:

(a) No person shall bring into this State, or accept for disposal in this State, any solid or liquid waste which originated or was collected outside the territorial limits of this State. This Section shall not apply to:

1. Garbage to be fed to swine in the State of New Jersey;

In order to enforce these statutes and rules HMDC and DEP filed a complaint seeking permanently to enjoin Municipal Sanitary Landfill Authority (hereinafter MSLA)[3] from accepting for disposal at its landfill sites any solid waste originating or collected outside of the State's territorial borders.[4]. At the same time, with the consent of the defendants, an order to show cause issued with temporary restraints prohibiting MSLA from accepting for disposal out-of-state waste. On the return day of the order to show cause, defendants answered, challenging the constitutionality of both the DEP and HMDC regulations as well as the statutes authorizing their promulgation. Thereafter the City of Yonkers, New York, was granted leave to intervene as a party defendant, as it was then using an MSLA site to dispose of its municipal refuse. No testimony was taken; the parties relied on affidavits and the transcript of previous

2. Any separated waste material, including newsprint, paper, glass and metals, that is free from putrescible materials and not mixed with other solid or liquid waste that is intended for a recycling or reclamation facility;

3. Municipal solid waste to be separated or processed into usable secondary materials, including fuel and heat, at a resource recovery facility provided that not less than 70 per cent of the thru-put of any such facility is to be separated or processed into usable secondary materials; and

4. Pesticides, hazardous waste, chemical waste, bulk liquid, bulk semi-liquid, which is to be treated, processed or recovered in a solid waste disposal facility which is registered with the Department for such treatment, processing or recovery, other than by disposal on or in the lands of this State. [*N. J. A. C.* 7:1–4.2] An earlier DEP regulation was before the trial court in the Hackensack Meadowlands case and is set forth in the court's opinion. 127 *N. J. Super.* at 164. It was expressly repealed at the same time that it was superseded by the regulation last above quoted. *N. J. A. C.* 7:26–1.5.

[3]Municipal Sanitary Landfill Authority is a joint venture wholly owned and operated by other named defendants. Its landfill operations are located in the Town of Kearny, within the Hackensack Meadowlands District.

[4]Plaintiffs also sought statutory penalties pursuant to *N. J. S. A.* 13:1I–5.

proceedings before the Hackensack Meadowlands Commission. In February, 1974, the trial judge filed a written opinion declaring the DEP and HMDC regulations to be in contravention of the Commerce Clause of the United States Constitution and therefore invalid. *Hackensack Meadowlands Development Commission v. Municipal Sanitary Landfill Authority, supra,* 127 *N. J. Super.* 160 (Ch. Div. 1974). Judgment was temporarily stayed and on March 26, the Appellate Division granted plaintiffs' motion for a further stay pending determination of the appeal. Upon application by plaintiffs, this Court granted certification while the appeal was pending unheard in the Appellate Division, *R.* 2:12–2, 66 *N. J.* 337 (1974).

In January, 1974, in a separate plenary suit, the City of Philadelphia, together with other plaintiffs mentioned above, filed a complaint seeking a declaration that the Waste Control Act, as well as the regulations promulgated pursuant thereto, violated the Constitutions of both the United States and the State of New Jersey, and further seeking temporary and permanent injunctive relief restraining DEP from enforcing the statutory provisions and from adopting or enforcing regulations intended to be in furtherance of the statutory purpose. On March 25, 1974 the trial judge (not the judge who had heard the *Hackensack Meadowlands* case), on cross-motions for summary judgment, rendered an oral opinion declaring that *N. J. S. A.* 13:1I–9 and 10 effected an improper discrimination against interstate commerce and were hence unconstitutional. Following the filing of a notice of appeal to the Appellate Division, we again granted direct certification, 67 *N. J.* 102, 335 A. 2d 55 (1974), and the two actions were brought on for argument and disposition before us at the same time.

We thus face an issue of major public importance, namely, whether the regulations and statutes under review, designed to meet a pressing emergency in the life of the State, are of

such a nature as to violate the Commerce Clause, Article I, § 8, clause 3, of the United States Constitution.[5]

## II

The Court is acutely aware of the solid waste disposal problem which now exists in the State of New Jersey. Very recently we recognized that it had reached "crisis proportions" due to the increasing scarcity of sites for dumping and landfill. *Southern Ocean Landfill, Inc. v. Mayor and Council of the Township of Ocean,* 64 *N. J.* 190, 193 (1974). The facts presented in the two cases now before this Court, together with the legislative concern with this problem to which we have alluded above and of which more will be said below, serve to reinforce very strongly our consciousness of this extremely serious situation.

The materials constituting the records on these appeals reveal that since the effective date of the creation of HMDC, July 1, 1968, three surveys have been conducted to determine the volume and origin of the solid waste disposed of in the landfills located within HMD. The first survey, mandated by *N. J. S. A.* 13 :17–10 (a), found that in 1968 approximately 30,000 tons of solid waste entered HMD each week, of which about 4,000 tons originated outside of New Jersey. The second survey, conducted in 1971, indicated that the total volume of solid waste disposed of in the District had risen to 42,000 tons per week, 5,000 tons of which originated outside of the State. The latest survey, conducted in 1973, revealed further increases to total weekly deposits of 55,000 tons of

[5]We do not reach the question of the validity of the regulations and statutes when measured against the Privileges and Immunities Clause, Article IV, § 2 of the United States Constitution. The argument for invalidity was found to be totally without merit in the HMDC case, 127 *N. J. Super.* at 168–69, and has not been briefed before us by the parties in either of the two suits.

solid waste, of which about 10,000 tons came from out of state.[6]

On the basis of the 1973 survey, it was estimated by HMDC that the existing landfill sites within HMD had a useful life of about three years, but that a ban on out-of-state refuse would extend their availability by approximately six months. Since the adoption of the ban on out-of-state dumping, the HMDC revised its estimates of the remaining life of the landfills within the HMD. It was calculated that as of January 1, 1974, sanitary landfills within that area had a total life expectancy of about 38 months if the ban were to be continued, but an availability of only 26 months if the ban were to be lifted. Furthermore, there is little chance of reducing the volume of garbage being dumped in the HMD which originates within the State, for the reason, among others, that the Commission has become obligated by statute, *N. J. S. A.* 13:17–10, to provide solid waste disposal facilities for over 100 New Jersey municipalities.

State-wide, the picture appears much the same. It was estimated that in 1971 over 40,000 tons of solid waste originating out of state was being buried each week in the 340 sanitary landfills then existing within the State. DEP estimated that in that year 1.5 million tons of solid waste originating outside of the State was buried in New Jersey. DEP has also recently computed the total life of the existing sanitary landfill facilities to be about three years in northern New Jersey and approximately ten years in the southern part of the State. It has also been estimated that a statewide prohibition on solid waste originating elsewhere would lengthen the state-wide landfill life by approximately 8%, with the increase in some specific landfills being as high as 50 to 100%.

Compounding the shortage problem are other extremely important environmental considerations. Many existing land-

---

[6]It was determined that about 6,700 of the 10,000 tons were being disposed of in the three MSLA sites.

fills within the State are located within ecologically sensitive areas, such as floodplains and wetlands, or on State-owned public trust tidelands. The operation of landfills now located in these areas may have to be limited or discontinued. An example of this is the action taken by the HMDC in preserving some 1,500 acres of virgin wetlands which had formerly been tentatively designated for use as landfill sites. Further actions of a similar nature are contemplated, thus reducing the estimates of the potential lifespans of such existing facilities.

To obtain a more comprehensive picture of the problem now facing this State, we have taken judicial notice of another report, released in 1972, which has further documented the crisis in this area.[7] According to this report, in 1972 almost 95% of New Jersey's solid waste was disposed of in landfills within the State. Further projections indicate that with the existing landfill acreage and the projected rate of dumping, all land that is presently committed to landfill operations will be exhausted by 1982. Also recognized is the strong probability that other environmental considerations may further limit the use for landfill purposes of much of the existing allocated acreage. Moreover, the HMD is singled out as an area where "[a] critical test of creative solid waste management is now taking place . . . ." The report estimated that by the end of 1975, the supply of acreage available for landfill in the Meadowlands would be exhausted, an estimate very similar to those made by the HMDC and noted earlier in this opinion.

We are also aware that very little has yet been done — in any really effective way — on either a national or an interstate level to achieve a satisfactory solution to this pressing problem. The scope of federal legislation is thus far quite limited. The Solid Waste Disposal Act, 42 *U. S. C. A.* 3251 *et seq.*, originally provided only for "financial and technical

---

[7]State of New Jersey County and Municipal Government Study Commission, Solid Waste: A Coordinated Approach (1972).

assistance and leadership . . ." to develop new methods to reduce the volume of waste and to provide for economical methods of disposal, 42 *U. S. C. A.* § 3251(a) (6). The Resource Recovery Act of 1970 amended the Solid Waste Disposal Act to provide financial assistance for the construction of solid waste disposal facilities and to furnish technical and financial assistance to promote and develop new methods of resource recovery. See, *e. g.,* 42 *U. S. C. A.* §§ 3251(b) (1), 3254b. Although the Act as it now reads also provides for the encouragement of interstate cooperation to resolve the waste disposal problem, 42 *U. S. C. A.* §§ 3254, 3254a, nothing has been brought to our attention to indicate that New Jersey has entered into any agreement with her neighboring states of New York and Pennsylvania looking to this end.[8]

At the State level there has been more significant activity. In 1970 the Bureau of Solid Waste Management of DEP published the *New Jersey State Solid Waste Management Plan,* which, among other proposals, recommended the creation of "Solid Waste Management Districts."[9] The *Solid Waste Management Plan* has been approved by the Federal Environmental Protection Agency as the official State plan for New Jersey.

Before the release of the *New Jersey Plan* in 1970, the Legislature had enacted the "Incinerator Authorities Law,"

---

[8]In 1970, the Tri-State Transportation Commission [Connecticut, New York, and New Jersey] published a report entitled *Managing the Natural Environment — A Regional Plan for Water, Sewage, Air and Refuse.* The Commission, interestingly, foresaw the problem with which we are now faced, in its recognition that an interstate solution to the solid waste problem might be difficult to achieve because of increasing resistance to waste "imports." The Commission, therefore, recommended the continued use of landfill sites wherever possible along with regional development of large, efficient incinerators for the cities and inner suburbs. *Id.* at 32. To date, however, the Commission has been ineffective in bringing about the implementation of any of these suggestions.

[9]The Plan recommended either a "maximum sanitary landfill strategy" or a "maximum incineration strategy," depending on the availability of sanitary landfill acreage.

*N. J. S. A.* 40:66A–1 *et seq.*, delegating to municipalities the authority to provide solid waste collection and disposal facilities on a local basis. Prior thereto, in 1968, the "Solid Waste Management Authorities Law" had been enacted, *N. J. S. A.* 40:66A–32 *el seq.*, permitting the governing bodies of one or more municipalities to create solid waste management authorities to construct and operate incinerators and other solid waste treatment facilities. 1970, the year DEP released its *New Jersey Plan,* saw three further related enactments by the Legislature. The "Solid Waste Utility Control Act," *N. J. S. A.* 48:13A–1 *et seq.*, recognizing the need for state-wide control over the solid waste industry, provided that the Board of Public Utility Commissioners assume the duties of "regulating [the] economic aspects of solid waste collection, disposal and utilization service. . . ." *N. J. S. A.* 48:13A–2. The "County Solid Waste Disposal Financing Law," *N. J. S. A.* 40:66A–31.1, *et seq.*, took note of the fact that the cost of constructing disposal facilities would be prohibitive for many municipalities, and delegated to counties the authority to purchase or construct such facilities within the county "either alone or jointly with any municipality." *N. J. S. A.* 40:66A–31.4 (1). Finally, the "Solid Waste Management Act," *N. J. S. A.* 13:1E–1 *et seq.*, provided DEP with the authority to "supervise solid waste collection and disposal facilities or operations," and to plan all future facilities having in mind that they should conform to "reasonably contemplated development of comprehensive community or regional solid waste collection and disposal facilities and operations and to any Statewide, regional, county and intercounty plans for solid waste management," *N. J. S. A.* 13:1E–4. These statutes are in addition to the Hackensack Meadowlands Reclamation and Development Act and the Waste Control Act that are earlier discussed above.

Supplementing these statutory provisions, the HMDC has recently announced blueprints to phase out all dumping

in the Meadowlands by 1979. It is currently planning to construct a baling plant to compact waste into solid, non-flammable building blocks that may then be used as the base of a 2,000 acre meadowlands park located upon existing landfill sites. Also projected is a resource-recovery plant.

Assuming that plans such as these formulated by the HMDC are implemented within the proposed time period, it is entirely reasonable to forecast that the extension of the lifespan of existing landfills, resulting from the exclusion of out-of-state waste, may be of crucial importance in preventing further virgin wetlands or other undeveloped lands from being devoted to landfill purposes. Increasing the lifespan of the HMDC landfills would also alleviate future pressure on other landfills located throughout the State, to accept waste now handled by HMDC, thereby preventing any acceleration of their depletion and preserving lands in other areas of the State from becoming disposal areas.[10]

### III

It is in the light of these facts and with a full realization of the magnitude of the problem, that we address ourselves to the issue as to whether or not the statutes and regulations under attack must fall because they are found to constitute an impermissible burden upon interstate commerce. In both cases now before us the State preliminarily contends that the question of the significance of the burden should not be reached, as the movement of garbage and

---

[10]There is every indication that this was the true reason for the enactment of the amendments to the Waste Control Act. (*L.* 1973. c. 363). Following the promulgation of the regulations banning out-of-state dumping in HMDC, the out-of-state wastes were then carried to smaller landfill sites in New Jersey which had been originally designed to serve only neighboring municipalities. Thus, in order to prevent the total depletion of these landfills, a state-wide ban on solid waste imports was enacted.

refuse, things not of commercial value and harmful to the health and welfare of the citizens of the State, does not in fact constitute interstate commerce within the meaning of the constitutional phrase. Therefore, it is argued, any statutes or regulations prohibiting the importation of these deleterious and valueless substances would not violate the Commerce Clause. The HMDC regulations are broadly drawn to exclude all solid wastes collected or originating out-of-state, while the Waste Control Act, through the promulgation of regulations by DEP, has in effect been amended to exclude only that refuse which has no value either for fuel or recycling purposes.

The theory that objects harmful to the general public fall beyond the purview of the Commerce Clause has long been recognized by the United States Supreme Court. Perhaps the best articulation of this doctrine appears in *Bowman v. Chicago & Northwestern Ry. Co.*, 125 *U. S.* 465, 8 S. Ct. 689, 31 *L. Ed.* 700 (1888):

* * * Doubtless the States have power to provide by law suitable measures to prevent the introduction into the States' of articles of trade, which, on account of their existing condition, would bring in and spread disease, pestilence, and death, such as rags or other substances infected with the germs of yellow fever or the virus of small-pox, or cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption. Such articles are not merchantable; they are not legitimate subjects of trade and commerce. They may be rightly outlawed as intrinsically and directly the immediate sources and causes of destruction to human health and life. The self protecting power of each State, therefore, may be rightly exerted against their introduction, and such exercises of power cannot be considered regulations of commerce prohibited by the Constitution. [125 *U. S.* at 489, 8 S. Ct. at 700, 31 *L. Ed.* at 708]

*Accord, Baldwin v. Seelig,* 294 *U. S.* 511, 525, 55 S. Ct. 497, 501, 79 *L. Ed.* 1032, 1039 (1935); *Sligh v. Kirkwood,* 237 *U. S.* 52, 59–60, 35 S. Ct. 501, 502–03, 59 *L. Ed.* 835, 838 (1915). *See Crossman v. Lurman,* 192 *U. S.* 189, 196–97, 24 S. Ct. 234, 236, 48 *L. Ed.* 401, 404 (1904); *Plumley v. Massachusetts,* 155 *U. S.* 461, 472, 15 S. Ct. 154, 158, 39 *L.*

*Ed.* 223, 227 (1894). Also pertinent to the proposition that garbage or refuse is not an article of interstate commerce is the decision in *Clason v. Indiana,* 306 *U. S.* 439, 59 S. Ct. 609, 83 *L. Ed.* 858 (1939). That case involved the validity of an Indiana statute which required that within 24 hours after the death of certain large animals, the owners should burn or bury the carcasses or deliver them to a disposal plant licensed to do business within the state. Transportation for disposal to points outside the state was prohibited. 306 *U. S.* at 441, 59 S. Ct. at 610, 83 *L. Ed.* at 860. The Supreme Court, after recognizing that the purpose of the statute was not discriminatory, but rather to promote the health of the people, concluded that no impermissible burden on interstate commerce had been shown to exist or was likely to occur. *Id.* at 444, 59 S. Ct. 611–12, 83 *L. Ed.* at 862.

The teaching of these cases seems to be that commodities or substances injurious to the public health are not "articles of commerce" within the meaning of the constitutional phrase. Their lack of market value coupled with their immediate threat to human health dictates that such substances not be afforded the protection of the Commerce Clause.

Nevertheless, refuse or solid waste may have intrinsic value of its own. As the trial judge noted in *Hackensack Meadowlands,* ". . . refuse may be utilized for construction, landfill, recycling of paper, bottles and metal, and production of electricity." 127 *N. J. Super.* at 170. Based on this factor, that court concluded that "the regulations in question here which are directed to the restricted use of sites for New Jersey garbage cannot be sanctioned on the concept that garbage is not a legitimate subject of interstate commerce." *Id.* We readily recognize that modern technology is such that certain types of solid waste may have legitimate market value for recycling or other purposes. We therefore agree with the decision below, insofar as the HMDC regulations are concerned, that they cannot be sustained on the theory that no item of interstate commerce

is involved, as these regulations do clearly attempt to exclude from the HMD even those types of wastes which may have some potentiality of useful renewal.

The amendments to the Waste Control Act, *N. J. S. A.* 13 :1I–9 and 13 :1I–10,[11] totally banning the disposal of solid waste originating out-of-state, also fail to make any provision for excepting those types of solid waste which may be renewed. Nevertheless, as we have pointed out, the DEP regulations, issued in response to the legislation, do except from the ban on out-of-state refuse those types of solid waste which may have a value for recycling or for use as fuel.[12] In view of the confining effect of this latter regulation, it is clear that an argument challenging the validity of the Waste Control Act on Commerce Clause grounds, unlike the argument challenging the HMDC regulations, cannot be premised on the existence here of "merchantable" items or legitimate "articles of trade," as those wastes which can be put to effective use are explicitly excepted from the ban. Any assertion that the Commerce Clause applies here must therefore rest on the proposition that the mere transportation and disposal of valueless waste between states constitutes interstate commerce within the meaning of the constitutional provision.

A short time ago, in *United States v. Pennsylvania Refuse Removal Ass'n.,* 242 *F. Supp.* 794 (E. D. Pa. 1965), *aff'd,* 357 *F.* 2d 806 (3d Cir.), *cert. denied,* 384 *U. S.* 961, 86 S. Ct. 1588, 16 *L. Ed.* 2d 674 (1966), the transportation and disposal of refuse was itself specifically found to constitute interstate commerce. That case was a Sherman antitrust action brought against an association of refuse removers in the greater Philadelphia area who collected in Pennsylvania but often dumped in New Jersey. 242 *F.*

---

[11]Quoted above in footnote 1.

[12]DEP was enjoined by the decision below from enforcing these regulations as well as the relevant sections of the Waste Control Act. These regulations are quoted in footnote 2 above.

*Supp.* at 796. The District Court found that the government had clearly met its burden of showing that defendants' business was commerce, and was interstate in nature. *Id.* at 796–97. The court emphasized that the real subject of "trade or commerce" was not the worthless garbage that was being transported but rather the valuable service of its removal and disposal. *Id.* at 799.

█ The *Pennsylvania Refuse* case affords an illustration of the part played by the Commerce Clause as justification for bringing a particular business scheme within the reach of a Congressional regulatory enactment. The Sherman Act purports only to prohibit as illegal *certain* combinations in restraint of trade or commerce, namely, those where the trade or commerce is interstate in nature. This is the *affirmative* aspect of the Commerce Clause — to support some exertion of federal control or regulation. Similarly, persons engaged in a disposal business, interstate in nature, have been found to come within the scope of the federal Fair Labor Standards Act. *Schultz v. Instant Handling, Inc.,* 418 *F.* 2d 1019 (5th Cir. 1969); *Barnett v. A-1 Scavenger Service Co.,* 466 *S. W.* 2d 150 (Mo. Ct. App. 1971). But we deal here, in the case before us, with what are customarily called the "negative implications" of the Commerce Clause, the extent to which it may be invoked — not to support an exercise of federal regulation — but rather to strike down or restrict state legislation. The Supreme Court has understandably adopted a very sweeping concept of the Commerce Clause in its affirmative application, in order to further the extent of Congressional control. A much more confined notion of the reach of this provision has, however, been manifested, as we shall see, when it has been invoked to prohibit or limit state action.

## IV

██ Assuming for present purposes that the service of transporting and disposing of solid waste in the factual con-

text here presented is in fact interstate commerce in the constitutional sense, we next consider the contention that the relevant sections of the Waste Control Act amount to an improper effort to regulate such commerce since such control lies within the exclusive cognizance of the federal government. In considering this preemption argument in relation to the cases now before us, we note initially that in the *Hackensack Meadowlands* case the trial court determined that in this area of solid waste disposal no such preemption is to be found. 127 *N. J. Super.* at 171.

The need to determine whether, in a particular segment of interstate commerce, a state is precluded from acting because of federal preemption is the direct result of the landmark decision of the United States Supreme Court in *Cooley v. Board of Wardens,* 53 *U. S.* (12 How.) 299, 13 *L. Ed.* 996 (1851). There the Court for the first time clearly recognized that states have concurrent authority with the federal government to deal with those subjects of interstate commerce which do not necessarily require a national or uniform system of regulation. In a more recent statement appearing in *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 *U. S.* 132, 83 S. Ct. 1210, 10 *L. Ed.* 2d 248 (1963), Justice Brennan laid down the rule that a state would be precluded from acting only where either the "nature of the subject matter" or an "explicit declaration of congressional design" indicated that state efforts were to be precluded. *See* 373 *U. S.* at 143–52, 83 S. Ct. at 1217–22, 10 *L. Ed.* 2d at 257–62.

The problem which arises in most instances where Congress has acted — as is here the case — results from there having been a failure on the part of Congress to make clear whether there was or was not a desire and intent on its part to exercise exclusive control in a particular area. The Supreme Court has recognized that "in the final analysis, there can be no one crystal clear distinctly marked formula," *Hines v. Davidowitz,* 312 *U. S.* 52, 67, 61 *S. Ct.* 399, 404, 85 *L. Ed.* 581, 587 (1941), resort to which will in all cases unequivocally reveal Congressional intent. *Benson, The Supreme*

*Court and the Commerce Clause,* 1937–1970 at 277–78 (1970).

Fortunately, although Congress has acted in this field through the passage of the Solid Waste Disposal Act of 1965 and its subsequent amendments, it has clearly indicated its intention not to preempt the area. As we have noted earlier, federal legislation has thus far been largely limited to providing "financial and technical assistance and leadership" to develop new methods of disposal and resource recovery and to reduce waste. In the Congressional findings is a pronouncement that "the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies. . ." 42 *U. S. C. A.* § 3251(a) (6). We also note that severe budgetary cuts in recent years have reduced federal action even below that originally envisioned in the Solid Waste Disposal Act. For example, the Nixon Administration cut the federal solid waste budget from $30 million in 1973 to a projected $5.8 million for the fiscal year 1974, and sought to restrict the federal role to the control and disposal of hazardous wastes. No further funds were provided for such items as research and development, and technical assistance was substantially curtailed. See Environmental Law Institute, *Federal Environmental Law* 1307–1310 (1974).

It is entirely clear that the case for federal preemption must fall. Congress has encouraged state action; it has not precluded it.

V

In considering whether the statutes and regulations here under scrutiny do or do not constitute an impermissible regulation of interstate commerce, we bear in mind that the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not in division." *Baldwin v. Seelig, supra,* 294 *U. S.* 511, 523, 55

S. Ct. 497, 500, 79 *L. Ed.* 1032, 1038 (1935). Primarily the purpose sought to be served by including the Commerce Clause in the Constitution was to check or eliminate the *economic* discrimination among the states that had been so rampant under the Articles of Confederation. *E. g., Baldwin v. Seelig, supra,* 294 *U. S.* at 521–23, 55 S. Ct. at 499–500, 79 *L. Ed.* at 1037–38; *H. P. Hood & Sons, Inc. v. DuMond,* 336 *U. S.* 525, 533–35, 69 S. Ct. 657, 662–63, 93 *L. Ed.* 865, 871–72 (1949); *Ribble, State and National Power Over Commerce* 3–4 (1937).

Despite this broad grant of power given Congress by the Commerce Clause, innumerable problems have continuously arisen. This is in large part because the states, in the exercise of their police power to protect the health, welfare and safety of their citizens, have passed many laws which often in effect do directly regulate interstate commerce. Thus over the years the United States Supreme Court has been called upon to arbitrate between these competing demands of state and federal power.

The cases before us present such a situation. We have no difficulty in finding, as did the courts below, that extending the lifespan of existing landfills and thereby preserving further acreage from use as disposal sites is a legitimate and valid exercise of the police power of the State. Our Appellate Division has recognized that garbage and refuse may provide a direct threat to the public health, *Shaw v. Byram Township,* 86 *N. J. Super.* 598, 602 (App. Div.), *certif. denied,* 45 *N. J.* 35 (1965) and indeed the point is self-evident. Likewise, the detrimental effects which sanitary landfills have upon the environment have been acknowledged:

\* \* \* Sanitary landfills conducted on virgin land forever ruin the possibility of preserving the site for conservation. Additionally, such landfill operations can have an adverse effect on the ecological balance of the surrounding area. A sanitary landfill operation also has *severe limiting effects on future development of the property.* Problems of settlement, gas generation, and fires make it difficult to construct structures on former landfill sites. [*Municipal Sanitary Landfill Authority v. Hackensack Meadowlands Development Commission,* 120 *N. J. Super.* 118, 122 (App. Div. 1972); emphasis in original]

We recognize, and now emphasize, that the objectives of the statutes and regulations in question are not only to preserve the health of New Jersey residents by keeping their exposure to solid waste and landfill areas to a minimum, but also to preserve for the benefit of both present and future generations the natural habitat and ecological values which landfill usage would destroy. The Supreme Court has recognized that the protection of public health through the preservation of the environment is a valid, and indeed primary, objective of the police power. *Huron Portland Cement Co. v. Detroit,* 362 *U. S.* 440, 442, 80 *S. Ct.* 813, 815, 4 *L. Ed.* 2d 852, 855 (1960). Today it cannot possibly be questioned that the preservation of the environment and the protection of ecological values are, without more, sufficient to warrant an exercise of this power. See, for example, *Adams v. Shannon,* 7 *Cal. App.* 3d 427, 432, 86 *Cal. Rptr.* 641, 644 (Ct. App. 1970); Garton, *Ecology and the Police Power,* 16 *S. D. L. Rev.* 26 (1971).

Thus the underlying issue is whether or not this exercise of residual state power, obviously exerted for legitimate and important purposes, must fail because of the demands of the Commerce Clause. We do not deem it necessary or useful to retrace in any particular detail the history of the negative implications of the Commerce Clause or the manner in which this body of doctrine has evolved through successive decisions of the Supreme Court. Dicta in *Gibbons v. Ogden,* 22 *U. S.* (9 Wheat.) 1, 209, 6 L. Ed. 23, 73 (1824) suggested that the intent of this grant of power to Congress had been to exclude entirely concomitant action on the part of the states. At least, however, since *Cooley v. Board of Wardens, supra,* 53 *U. S.* (12 How.) 299, 13 *L. Ed.* 996 (1851), it has been clear that state legislation will not necessarily be deemed unconstitutional simply because it can be shown that it may have some impact upon commerce that is interstate in nature. Over the years the Supreme Court has applied various tests and has adopted differing approaches in its treatment of the problem as to whether particular state

legislation does or does not fall within the interdict of this provision.

In 1938, in the case of *South Carolina State Highway Department v. Barnwell Bros.*, 303 *U. S.* 177, 58 S. Ct. 510, 82 *L. Ed.* 734, the Court considered a South Carolina statute that had established size and weight limits for trucks using state highways. The result of enforcing the statute was to exclude many vehicles coming from other states that were engaged in interstate commerce. The Court found that the statute did not violate the Commerce Clause. In commenting upon this case, Professor Engdahl recently observed,

> [T]he court now [in *Barnwell*] formulated better than had been articulated before the test of the negative implications of the commerce clause. In Stone's words, the court is to inquire "whether the state legislature in adopting regulations such as the present has acted within its province, and whether the means of regulation chosen are reasonably adapted to the end sought." 303 *U. S.* at 190 [58 S. Ct. at 510]. [*Engdahl, Constitutional Power: Federal and State* (1974) § 11.03, p. 272]

In addressing the first of these criteria — whether the state legislature has acted within its province — at least two subordinate issues demand attention: can it be said that the subject matter of the legislation has been preempted by Congress, and is the enactment a valid and proper exercise of the state's police power. It was probably implicit in *Barnwell*, as it has been explicit in both earlier and later decisions, that state legislation must also meet a third test — whether the burden imposed on interstate commerce by the state statute exceeds or outweighs the benefit accruing to the state. Recent commentators have questioned whether this third "weighing" test should be, or will continue to be, applied. *Engdahl, op. cit. supra*, § 11.08, pp. 290–94; *Note, 45 Univ. of Col. L. Rev.* 487, 489 (1974). In any event it seems clear that it has not yet been entirely abandoned. *Pike v. Bruce Church*, 397 *U. S.* 137, 142, 90 S. Ct. 844, 847, 25 *L. Ed.* 2d 174, 178 (1970). *But see Brotherhood of*

*Locomotive Firemen & Enginemen v. Chicago, Rock Island & Pacific R. R.,* 393 *U. S.* 129, 89 S. Ct. 323, 21 *L. Ed.* 2d 289 (1968).

In the case before us it is evident that the New Jersey Legislature — and the agencies that adopted implementing regulations — were looking to the accomplishment of a wholly legitimate end well within their competence. In seeking to prolong the useful lifespan of landfill areas within the state they were ministering to the needs of public health as well as endeavoring to preserve the environment. As we have indicated, there has very clearly been no federal preemption and the legislation is certainly an appropriate exercise of the state's police power. *Cf. Oxford Consumer Discount Co. of North Philadelphia v. Stefanelli,* 102 *N. J. Super.* 549, 567–574 (App. Div. 1968), *modified,* 104 *N. J. Super.* 512 (App. Div. 1969), further *modified,* 55 *N. J.* 489 (1970). Nor can it seriously be urged that the means employed were not suitable to the end sought to be attained. Less than total exclusion of solid waste generated outside New Jersey would have been of no avail. Even the means that have been adopted — apparently the best available — offer no certainty of providing more than much needed time within which to devise by technological effort and ingenuity a satisfactory ultimate solution. Nor has there been discrimination, at least in the economic sense. In examining this point we must look to the ends sought to be achieved. Here the purpose of the legislation is to protect the inhabitants and vital resources of New Jersey, not to impose economic barriers or create commercial restrictions. Nor is there any real or significant discrimination in favor of local collectors. Refuse amassed by them outside the State may not be brought into New Jersey. Conversely, residents of other states are free to collect and dump within the state.

The further step in the testing process would require us to assay the burden on interstate commerce and to weigh it against the benefit to the state. That burden is slight indeed.

There is nothing to indicate that adequate alternatives are not available in both New York and Pennsylvania. The City of Yonkers has access to the Croton dump in New York at a modest increase in cost of five dollars per ton. Philadelphia's stated alternatives are either to install adequate air pollution devices in their existing incinerators or to establish new landfill sites outside the city, which would require the purchase of additional disposal trucks. When balanced against the dangers to public health and to the environment that this legislation seeks to avert, these relatively small costs and modest inconveniences seem minor indeed.

Other state and federal courts in very recent years have not hesitated to sustain legislation having as its aim the protection of health and the maintenance of environmental values and natural resources against attacks based upon alleged violations of the Commerce Clause. *American Can Co. v. Oregon Liquor Control Commission,* 15 *Or. App.* 618, 517 *P.* 2d 691 (1973) (ban on non-returnable beverage containers); *Procter & Gamble Co. v. City of Chicago,* 509 *F.* 2d 69 (7th Cir. 1974), *cert. denied,* 421 *U. S.* 978, 95 S. Ct. 1980, 44 *L. Ed.* 2d 470 (1975) (ban on phosphate detergents); *Portland Pipe Line Corp. v. Environmental Improvement Commission,* 307 *A.* 2d 1 (Sup. Jud. Ct. Me. 1973), *appeal dismissed,* 414 *U. S.* 1035, 94 S. Ct. 532, 38 *L. Ed.* 2d 326 (1973) (prevention and control of marine oil spillage); *Construction Industry Association of Sonoma County v. City of Petaluma,* 522 *F.* 2d 897 (9th Cir. 1975) (ban on further building).[13]

We know that not every hindrance to interstate commerce that may result from a state law will be deemed sufficient to invalidate the legislation. We know too and are constantly becoming more acutely aware that the environmental resources as well as ecological and human values that have

---

[13]A similar legislative ban on the importation of waste materials has been enacted in the State of Maine. See *Maine Rev. Stat. Ann. Title* 17, § 2253 (Supp. 1974–75).

become so endangered upon this "plundered planet," insistently demand every reasonable protection that can possibly be recruited.

In this area the state has not only a right to protect its own resources, but also the duty to do so, in the interest of its citizens, as well as others. We are not here concerned with the problem presented in such cases as *West v. Natural Gas Co.*, 221 *U. S.* 229, 31 S. Ct. 564, 55 *L. Ed.* 716 (1911) and *Pennsylvania v. West Virginia*, 262 *U. S.* 553, 43 S. Ct. 658, 67 *L. Ed.* 1117 (1923). There the Court was called upon to review state statutes restricting the flow of natural gas to citizens of the state in question. Quite understandably it was found that the enactments did violence to the Commerce Clause. In those cases the state effort was to preserve and exploit a resource for selfish economic and commercial gain; here it is to protect the health of its citizens and give some measure of precarious protection to its natural environment. The distinction is clear and it is basic. We know that there resides in each of the several states a power to protect its natural resources. This power is part of what has been called its quasi-sovereignty. In *Georgia v. Tennessee Copper Co.*, 206 *U. S.* 230, 27 S. Ct. 618, 51 *L. Ed.* 1038 (1907), the Supreme Court entertained an original action by the State of Georgia, in which the latter sought to restrain an out-of-state manufacturer from permitting deleterious fumes to be blown into the plaintiff state and do damage to trees, fields and crops. In determining that an injunction would issue, practically as of right, Justice Holmes said,

The case has been argued largely as if it were one between two private parties; but it is not. The very elements that would be relied upon in a suit between fellow citizens as a ground for equitable relief are wanting here. The state owns very little of the territory alleged to be affected, and the damage to it capable of estimate in money, possibly, at least, is small. This is a suit by a state for an injury to it in its capacity of quasi-sovereign. In that capacity the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain.

It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air. [206 *U. S.* at 237, 27 S. Ct. at 619, 51 *L. Ed.* at 1044]

It is true that there, the Court dealt with a nuisance, which is not present here. Yet the case has relevant import. The protection to its environment and natural resources that a state can demand of right from a federal court should be equally available to it by way of protective legislation. We do not mean to be understood as saying that every assertion of a state's quasi-sovereign right to protect its environment, ecological values and natural and human resources will be sustained regardless of the impact upon interstate commerce. Clearly this is not so. But where the effect upon trade and commerce is relatively slight, as is here the case, and where at the same time the values sought to be protected by the state legislation are as crucial to the welfare of its citizens as is here true, we have no hesitancy in sustaining the state action.

The judgments of the respective trial courts are hereby reversed; all stays or injunctive orders are vacated.

*For reversal in both cases* — Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD and Judge COLLESTER—6.

*For affirmance*—None.